## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PAUL GRIEGO,

        Plaintiff,

vs.                                                                     No. CIV 13-0929 JB/KBM

CITY OF ALBUQUERQUE;
ALBUQUERQUE POLICE DEPARTMENT;
and ALBUQUERQUE POLICE OFFICER
ROBERT STOCKTON, JR., in his individual
and official capacities,

        Defendants.

## <u>MEMORANDUM OPINION</u>[1]

**THIS MATTER** comes before the Court on the Motion to Dismiss, filed November 22,

2013 (Doc. 9)("MTD").  The Court held a hearing on July 24, 2014.  The primary issues are:

(i) whether a claim exists under 42 U.S.C. § 1983 for failure to properly investigate; (ii) whether

Plaintiff Paul Griego has sufficiently alleged a claim for failure to supervise or train, where he

makes a conclusory allegation that, on domestic-violence calls, Defendant Albuquerque (New

Mexico) Police Department ("APD") has a policy of making arrests -- usually of men rather than

woman -- even in the absence of probable cause; and (iii) whether Griego has properly alleged an

equal-protection claim, where he makes a conclusory allegation that, on domestic-violence calls,

APD systemically arrest men in circumstances in which they would not arrest women.  As to the

first issue, the Court will dismiss Griego's failure-to-investigate claim with prejudice, because he

has no independent constitutional or federal-statutory right to police investigation; he has only a

---

[1]The Court earlier entered an Order, filed September 11, 2014 (Doc. 27), granting in part
and denying in part the Motion to Dismiss, filed November 22, 2013 (Doc. 9).  In the Order, the
Court stated that it would "at a later date issue a memorandum opinion more fully detailing its
rationale for this decision."  Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

right to be free from an arrest without probable cause -- a right which can be vindicated through a false-arrest claim such as the one Griego alleges as his first claim.  As to the second issue, Griego has not sufficiently pleaded the existence of a city-wide policy, practice, or custom. Griego must plead facts that give rise to a plausible inference that the policy exists, rather than baldly asserting its existence.  The Court will thus dismiss Griego's claim for failure to train or supervise, but it will do so without prejudice to him seeking leave to amend his Verified Complaint, filed September 24, 2013 (Doc. 1)("Complaint"), to rectify the pleading deficiencies and reassert the claim.[2]  As to the third issue, although the policy that Griego asserts exists might plausibly violate the Equal Protection Clause, U.S. Const. amend. XIV, § 1, he runs into the same problem with his equal-protection claim that he does with his claim for failure to train or supervise; he merely asserts the existence of an informal policy, custom or practice by Defendant City of Albuquerque, without supporting this assertion with facts that render it plausible.  The Court will, thus, dismiss his equal-protection claim without prejudice.  Last, the Court will dismiss the eleventh claim in the Complaint without prejudice, and will dismiss with prejudice: (i) all claims against APD, because it is not a suable entity under the law of the United States Court of Appeals for the Tenth Circuit; (ii) all claims against Defendant Albuquerque Police Officer Robert Stockton, Jr., in his official capacity, because the official-capacity claims are redundant to claims against the City of Albuquerque; (iii) all state-law claims -- the fourth and twelfth claims in the Complaint -- because the statute of limitations bars them; and (iv) the substantive and procedural due-process claims in the ninth and tenth claims.  Griego stipulated to

---

[2]Because the Defendants filed a responsive pleading more than twenty-one days ago, see Defendant's City of Albuquerque and Robert Stockton's Answer to Plaintiff's Complaint, filed November 22, 2013 (Doc. 8), Griego may only amend his Complaint with the Defendants' consent or upon obtaining leave from the Court, see Fed. R. Civ. P. 15(a)(1)-(2).

the dismissal of these claims.  See Plaintiff's Memorandum in Opposition to Defendants' Motion

to Dismiss at 1-2, 12, filed December 16, 2013 (Doc. 12)("Response").[3]

## FACTUAL BACKGROUND

The Court accepts as true all facts alleged in the Complaint, as it must in ruling on a

motion to dismiss under rule 12(b)(6).  See Smith v. United States, 561 F.3d 1090, 1098 (10th

Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled

factual allegations in a complaint and view these allegations in the light most favorable to the

plaintiff."  (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).  On September 25,

2010, at approximately 12:40 p.m., Griego arrived at Amie Petersen's residence.[4]  See Complaint

---

[3]The Response states:

> Plaintiff agrees to dismiss the suit against PO Stockton in his official capacity and
> the Albuquerque Police Department.  In addition, the supplemental state law
> claims appear to be time barred and therefore the Fourth and Twelfth Causes of
> Action are hereby withdrawn.  In addition, the Plaintiff agrees to dismiss the
> substantive and procedural due process claims asserted in the Ninth and Tenth
> claims for relief in the Complaint.  Finally, Plaintiff requests leave to amend the
> Complaint to assert cognizable claims pursuant to the OJP Program Statute, as
> inaptly alleged in the Eleventh claim for relief in the Complaint.
>
> . . . .
>
> Plaintiff voluntarily withdraws the claim of violation of Title VI of the Civil
> Rights Act of 1964, however, Plaintiff has a valid claim pursuant to the OJP
> Program Statute based on other statutes and regulations, providing funding to
> Defendant City of Albuquerque through the Albuquerque Police Department.
>
> > Plaintiff therefore requests leave to amend the Complaint to state a valid
> claim for relief pursuant to the OJP Program Statute.

Response at 1-2.  Grigeo will have to file a separate motion to amend his Complaint, but the
Court will grant Griego's request insofar as he asks the Court to dismiss the eleventh claim
without prejudice to file a motion for leave to amend.

[4]Griego owns the residence, but Peterson -- and not Griego -- occupied the house at the
time.  See Complaint ¶ 11, at 4.

¶ 11, at 4.  Petersen and Griego have a daughter together, and Griego was making a previously agreed-upon visit to pick up their three-year-old daughter, Sophia.  See Complaint ¶ 11, at 4. Petersen approached Griego with a written list of issues that she wanted to discuss with Griego, and began angrily reading them aloud while Griego was holding Sophia in his arms.  See Complaint ¶ 12, at 4.  Griego indicated that he did not want to discuss these issues in front of Sophia, at which point Petersen told Griego that he could not take Sophia and tried to pull Sophia out of Griego's arms.  See Complaint ¶ 12, at 4.  Petersen's actions caused Sophia to cry out in pain, and nearly caused Griego to lose his balance and fall on Sophia.  See Complaint ¶ 12, at 4.

Griego left the house with Sophia and went to a gas station to call the police; this call occurred at 1:31 p.m. the same day.  See Complaint ¶ 13, at 5.  He then returned to his own home with Sophia and called police again, informing them in more detail about the altercation.  See Complaint ¶ 14, at 5.  Roughly twenty-five minutes later, paramedics and APD officer George Garcia arrived at Griego's residence.  See Complaint ¶ 15, at 5.  After the paramedics tended to Sophia -- who had small red marks on her arm -- and left, Garcia informed Griego that Petersen had also called police over the incident at her house.  See Complaint ¶ 18, at 5.  Garcia stated that, in a "two-call situation," he could not take action until he first spoke to the other police officer at the other scene.  Complaint ¶ 18, at 5.  Garcia left soon afterward, around 3:05 p.m. See Complaint ¶ 18, at 5.

At 6:03 p.m., APD officers Stockton and Garza arrived at Griego's home to ask him about the incident with Petersen.  See Complaint ¶ 19, at 6.  Stockton talked to Griego, while Garza took Sophia into the backyard to play and be away from the discussion.  See Complaint ¶ 20, at 6.  Griego explained to Stockton what happened, and, while the two were talking, Stockton interrupted Griego and told him that he was arresting him.  See Complaint ¶ 21, at 6.

- 4 -

Stockton admitted that he had not talked to Garcia, telling Griego only that he was "'required to make an arrest.'"  Complaint ¶ 21, at 6.  Stockton then placed Griego in handcuffs, put him in the back seat of his police cruiser, and drove him to the APD's Phil Chacon Memorial Substation, located at 800 Louisiana, SE.  See Complaint ¶¶ 21-22, at 6-7.  Petersen arrived to pick up Sophia; although she lives twenty-five minutes away from Griego, she arrived within a few minutes of Griego being placed in the police vehicle.  See Complaint ¶ 22, at 7.

At the substation, Stockton kept Griego handcuffed in the backseat of the cruiser for over an hour as he wrote his criminal complaint against Griego.  See Complaint ¶ 24, at 7.  Griego was ultimately charged with abandonment of abuse of a child, a third-degree felony under N.M. Stat. Ann. § 30-6-1D(1), and battery against a household member, a misdemeanor under N.M. Stat. Ann. § 30-3-15.  See Complaint ¶ 26, at 7-8.  Around 10:45 p.m., Griego was then taken to the Metropolitan Detention Center, where he was held for three days on a $10,000.00 bond.  See Complaint ¶¶ 27-28, at 8.  Griego was arraigned, and, at that time, his bond was reduced to $2,000.00.  See Complaint ¶ 29, at 8.  He posted bond on September 28, 2010, and was released under various conditions that included not being allowed to see Sophia unless the New Mexico Children, Youth and Families Department authorized the contact beforehand.  See Complaint ¶ 30, at 8.  He did not see his daughter until October 15, 2010, twenty days after the arrest.  See Complaint ¶ 30, at 8.

The deputy district attorney handling Griego's case dismissed the felony abandonment charges against him on October 25, 2010, noting that it was a mistake that it had been filed as a felony.  See Complaint ¶ 31, at 9.  In December, 2010, Stockton revised his police report to include language indicating that Griego was the "'overwhelming aggressor'" in the altercation

with Petersen.  Complaint ¶ 33, at 9.  On February 10 and 11, 2011, Griego took his case to a jury trial and was acquitted.  See Complaint ¶ 34, at 9.

On March 14, 2011, Griego became aware of domestic-violence self-defense classes that the APD offered as a part of a program called "'Women Against Crime.'"  Complaint ¶ 37, at 9-10.  Griego was denied enrollment to the class, because the classes were offered only to females.  See Complaint ¶ 37, at 10.

On July 1, 2011, Griego went to pick up Sophia at her daycare center, consistent with the custody agreement he had with Petersen.  See Complaint ¶ 38, at 10.  Sophia was not at the daycare center and Griego ascertained that she was at the home of Ivy Shofelt, Petersen's sister.  See Complaint ¶ 38, at 10.  Griego went to Shofelt's house to pick up Sophia, but Petersen was there and assaulted Griego, in front of Sophia.  See Complaint ¶ 38, at 10.  Griego returned to his residence with Sophia and called the APD the following morning to report the assault.  See Complaint ¶ 38, at 10.  Griego provided the APD with Shofelt's name and contact information, who was present and observed the assault.  See Complaint ¶ 38, at 10.  After speaking with Griego, the APD apparently never spoke with Shofelt or investigated the incident.  See Complaint ¶ 38, at 10.  APD officer Tammy Chavez gave Griego a domestic-violence packet and advised him to get a domestic restraining order.  See Complaint ¶ 38, at 10.

The domestic-violence packet that the APD provided indicated that victims of domestic violence can receive assistance through various resource centers, including the Family Advocacy Center.  See Complaint ¶ 39, at 10.  The Family Advocacy Center informed Griego to contact the Women's Law Initiative to obtain assistance in obtaining a domestic restraining order.  See Complaint ¶ 39, at 10.  Accordingly, Griego sought the Women's Law Initiative's assistance via telephone and explained the circumstances of his July 1, 2011 interaction with Petersen.  See

Complaint ¶ 39, at 10.  When Griego called the Women's Law Initiative, the representative listened to Griego and then told him to "'[h]ave a nice day'" before terminating the call. Complaint ¶ 39, at 11.  Griego also contacted the other relevant organizations and resources provided in the domestic-violence packet, but received no assistance from any of them.  See Complaint ¶ 40, at 11.

On July 28, 2011, Griego applied for a domestic restraining order, which was summarily denied that day; the judge denying the application noted that parents should comply with all court orders involving custody provisions.  See Complaint ¶ 41, at 11.  Of the five applicants for domestic restraining orders on the court's docket that day, only Griego's application was denied. See Complaint ¶ 41, at 11.  The other four applicants that day -- all women -- received domestic restraining orders.  See Complaint ¶ 41, at 11.

On November 24, 2011, Griego was scheduled to pick up Sophia.  See Complaint ¶ 42, at 11.  As it was Thanksgiving, the only location open for a possible exchange was McDonald's. See Complaint ¶ 42, at 11.  An exchange was scheduled for noon, but by 12:30 p.m., Petersen had not arrived, and the McDonald's had closed.  See Complaint ¶ 42, at 11.  Griego called the APD, which informed him that, when an exchange has not occurred within thirty minutes of the scheduled time, and there is a history of violence or disputes between the parents, police would arrive to provide a domestic-violence escort for the exchange.  See Complaint ¶ 42, at 11.  The police arrived at 12:45 p.m., and Griego informed them of the circumstances between himself and Petersen.  See Complaint ¶ 42, at 11.  Soon thereafter, Petersen arrived with Sophia.  See Complaint ¶ 42, at 11.  The police spoke with Petersen, and she handed over Sophia in front of the officers.  See Complaint ¶ 42, at 11.  APD officer Shane Treadway, one of the officers present, called Griego's brother, Eric.  See Complaint ¶ 42, at 11.  Treadway informed Eric that

Griego should not call the police for trivial matters and that they "gave Griego a break this time because it was Thanksgiving."  Complaint ¶ 42, at 11.

## PROCEDURAL BACKGROUND

Griego commenced this action in federal court on September 24, 2013.  He alleges twelve claims: (i) a claim for false arrest in violation of the Fourth Amendment to the Constitution of the United States of America under 42 U.S.C. § 1983, see Complaint ¶¶ 44-52, 12-13; (ii) a § 1983 claim for false imprisonment under the Fourth Amendment, see Complaint ¶¶ 53-64, at 14-16; (iii) a § 1983 claim for malicious prosecution, see Complaint ¶¶ 65-75, at 16-18; (iv) state-law claims for false arrest, false imprisonment, and malicious prosecution, see Complaint ¶¶ 76-92, at 18-20; (v) a claim under § 1983 and Monell v. Department of Social Services, 436 U.S. 658, 689 (1978)("Monell"), for failure to supervise and failure to train, see Complaint ¶¶ 93-105, at 21-23; (vi) a claim under § 1983 and Monell for failure to properly investigate, see Complaint ¶¶ 106-114, at 23-25; (vii) a claim under § 1983 and Monell for "relief for arrests conducted without probable cause or arrest warrants," Complaint ¶¶ 115-121, at 26-27 (capitalization altered for readability); (viii) a claim for violation of the Equal Protection Clause, see Complaint ¶¶ 122-132, at 27-29; (ix) a claim for violation of substantive due process, see Complaint ¶¶ 133-143, at 29-31; (x) a claim for violation of procedural due process, see Complaint ¶¶ 144-154, at 31-33; (xi) a claim for violation of "Title VI of the Civil Rights Act of 1964 and the 'OJP Program Statute,'" Complaint ¶¶ 155-166, at 34-36; and (xii) a state-law claim for intentional infliction of emotional distress, see Complaint ¶¶ 167-172, at 36-37.  Griego consents to dismissal with prejudice of claims four, nine, ten, and twelve, and to claim eleven without prejudice, until such time as he can amend the claim to rectify the "inapt[] alleg[ations]"

in the Complaint; he also consents to the dismissal of all claims against the APD and all official-capacity claims against Stockton.  Response at 1-2.  See note 3, supra, and accompanying text.

The City of Albuquerque filed the MTD on November 22, 2013, less than two months after Griego filed the Complaint.  It first argues for dismissal of the claims against the APD, the official-capacity claims against Stockton, and the state-law claims.  See MTD at 5-12.  Griego immediately capitulated to these arguments in his Response, so the Court will not summarize them here.  It next argues for dismissal of claim five, for failure to supervise and train, and claim six, for failure to properly investigate.  See MTD at 12-14.  The City of Albuquerque argues that Griego has not pled a policy, practice, or custom -- and a causal link between that policy and the plaintiff's constitutional injury -- as Monell requires, but, rather, has pled only negligence, which it says does not support liability under Monell.  See MTD at 13.  As for the failure-to-investigate claim, the City of Albuquerque appears to argue that such a claim does not exist at all, in any circumstances.  See MTD at 14.  It argues that a failure to investigate does not amount to a violation of a federal right, which it says is what is required to maintain a § 1983 action.  See MTD at 14.

The City of Albuquerque also moves to dismiss Griego's equal-protection claim in claim eight.  See MTD at 15-17.  It asserts that the Equal Protection Clause is triggered only "'when the government treats someone differently than another who is similarly situated.'"  MTD at 16 (quoting Buckley Const., Inc. v. Shawnee Civic & Cultural Dev. Auth., 933 F.2d 853, 859 (10th Cir. 1991)).  It also asserts that the plaintiff must allege some sort of discriminatory intent, "and although 'the discriminatory purpose need not be the only purpose, it must be a motivating factor in the decision.'"  MTD at 16 (alterations omitted)(quoting Villanueva v. Carere, 85 F.3d 481, 485 (10th Cir. 1996)).  The City of Albuquerque contends that the Complaint does not allege that

Stockton arrested Griego out of any discriminatory intent and that Griego cannot show that he was treated any differently than a woman would be in a similar situation.  See MTD at 16.

Griego filed his Response less than a month later, on December 16, 2013.  Griego argues that his Monell claims for failure to supervise and train and failure to properly investigate are properly pled.  See Response at 3-8.  He contends that, when a "'municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm,' it is liable," Response at 3 (quoting Barney v. Pulsipher, 143 F.3d 1299, 1309 (10th Cir. 1998)), and that, additionally,

> in a "narrow range of circumstances," . . . deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations.

Response at 4 (quoting Barney v. Pulsipher, 143 F.3d at 1307-08).  Griego then quotes extensively from ¶¶ 107-111, 116-118, 124-128, 141, and 151 of his Complaint, which he says alleges a policy, custom, or practice.  See Response at 4-6.  He draws special attention to ¶¶ 124 and 125, which state:

> Upon information and belief, it was the policy, practice, pattern, procedure and/or custom of ALBQUERQUE and/or APD to make an arrest whenever the police respond to calls of domestic disturbances and/or abuse, regardless of the source of information.

> Upon information and belief, it was also the policy, practice, pattern, procedure and/or custom of ALBQUERQUE and/or APD to arrest a male participant instead of a female participant at the scene of a domestic disturbance.

Response at 6 (citations omitted)(quoting Complaint ¶¶ 124-125, at 28).  Griego notes that, every place in which the Complaint mentions negligence, it is in the context of Stockton's actions being "'intentional, reckless, malicious and/or negligent.'"  Response at 6.  Griego also argues

that he has adequately alleged a causal link between those policies and Stockton's deprivation of Griego's constitutional rights, quoting from ¶¶ 98-101 of the Complaint.  See Response at 7-8.

Griego also defends his eighth claim, the equal-protection claim.  See Response at 8-12. Griego contends that gender is a quasi-suspect characteristic and, thus, governmental gender-based classification are subject to intermediate scrutiny.  See Response at 9.  He asserts that the appropriate test for the Court to apply is "whether the government can demonstrate that its classification serves 'important governmental objectives' and is 'substantially related to achievement of those objectives.'"  Response at 9 (quoting Concrete Works of Colo., Inc. v. City & Cnty. of Denver, 321 F.3d 950, 959 (10th Cir. 2003)).  He further argues that, although "'there is no general constitutional right to police protection, the state may not discriminate in providing such protection.'"  Response at 9 (quoting Watson v. City of Kansas City, Kan., 857 F.2d 690, 694 (10th Cir. 1988)).  Griego then quotes extensively from ¶¶ 37-43, and cites to ¶¶ 124, 125, and 127-129 of the Complaint, arguing that these paragraphs sufficiently allege Equal Protection Clause-violating policy.  See Response at 9-11.  Griego argues that "these policies directly affect the male population," and that "violations can be established through the use of statistical analysis," which can be obtained only through discovery.  Response at 12 (citing Richmong v. J.A. Croson Co., 488 U.S. 469, 501-02 (1989)).  Accordingly, Griego contends that dismissal of his equal-protection claim is more appropriately reserved for the summary-judgment stage.  See Response at 12.

The City of Albuquerque replied to the Response two weeks later, on December 30, 2013.  See Defendants' Reply in Support of Their Motion to Dismiss, filed December 30, 2013 (Doc. 14)("Reply").  The City of Albuquerque first addresses the claim for failure to supervise or train, arguing that, unless the municipality's failure was a deliberate, conscious choice, it cannot

be held liable under <u>Monell</u>.  <u>See</u> Reply at 3 (citing <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989)).  It asserts that the fifth claim contains no allegation of deliberate indifference, and that Griego borrowed the allegations that he cites in his Response from the sixth claim -- and the fifth claim does not incorporate the sixth claim's allegations.  <u>See</u> Reply at 3-4.  The City of Albuquerque contends that all that Griego alleges is "that the City failed to 'adequately supervise, oversee, control and train Stockton,' *resulting* in 'intentional, reckless, malicious and/or negligent' acts by" Stockton.  Reply at 4 (emphasis in original)(quoting Complaint ¶¶ 97-105, at 21-23).  The City of Albuquerque argues that these allegations amount to allegations of negligence against it -- although the allegations are more serious against Stockton.  <u>See</u> Reply at 4.

The City of Albuquerque next tackles Griego's failure-to-properly-investigate claim, which it says lacks a basis in clearly established law.  <u>See</u> Reply at 5 ("Plaintiff has not articulated how a 'failure to investigate' amounted to a violation of his Fourth Amendment [or Fifth or Sixth Amendment] rights.").  Last, the City of Albuquerque turns to Griego's equal-protection claim.  <u>See</u> Reply at 6-8.  It contends that Griego

> has not made a *factual* allegation that he was arrested because he was a male participant in a domestic violence situation.  Plaintiff has only alleged that Officer Stockton told Plaintiff that he was "required to make an arrest."  Plaintiff has made one averment that "[u]pon information and belief, it was also the policy, practice, pattern, procedure and/or custom of ALBUQUERQUE and/or APD to arrest a male participant instead of a female participant at the scene of a domestic disturbance."  This averment is contrary to Plaintiff's factual allegations wherein he was involved in at least two subsequent domestic disturbance/violence situations with Amie Peterson in which he was not arrested.
>
> In an effort to bolster his Equal Protection claim, Plaintiff attempts to rely on events that occurred involving entities outside of the City, including, but not necessarily limited to the Second Judicial Court (for denying him a restraining order), the Family Advocacy Center, as well as two other incidents he had with Amie Peterson involving domestic disturbances in which he was not arrested.  However, Plaintiff has failed to make any allegation that there are others who

were similarly situated, who were treated differently than him, other than generally referring to males as a class of persons and make a general allegation that "upon information and belief" it was the City's policy to arrest a male participant instead of a female participant in a domestic disturbance incident.

Reply at 7 (emphasis in original)(citations omitted).

The Court held a hearing on July 24, 2014.  See Transcript of Hearing (taken July 24, 2014)("Tr.").[5]  Griego described his failure-to-train claim as follows:

> [W]hy is it that this is a Monell claim, and why is it that they failed to supervise and failed to train, I think it's going to be clear after we have ample discovery on this that in fact the city takes a posture consistent with what it says in the complaint when it's written and tacit or whether it's an accepted procedure and a pattern and practice that in fact when police do go to the scene of a domestic violence dispute someone is going to be arrested and the overwhelming majority of those instances, that individual is going to be the male, whether there is any evidence supporting any assault or any action on the part of the male that will gets arrested.  So just as no more August body than the U.S. Department of Justice and their investigation as determined that there were constitutional violations that APD caused that were base had on a pattern and practice of APD that included among many other things, the failure to take internal, inadequate internal accountability.   They found there was systemic insufficiency including insufficient oversight, inadequate training, ineffective policies contributing total Fourth Amendment violation.  A lack of proper supervisory review, a failure to identify and address officers requiring direction, improper supervisory documentation, failure to record incidents with their lapel cameras, internal review mechanisms.

Tr. at 8:3-9:5 (Baker).   The Court asked Griego what he contended to be the underlying constitutional violation -- i.e., the one that Stockton committed -- because the City of Albuquerque's policy must have caused that violation for it to be held liable under Monell.  See Tr. at 10:2-7 (Court).  Griego responded that Stockton had arrested him without probable cause, thus constituting a false arrest under the Fourth Amendment -- a claim that Griego alleged in his Complaint and that the City of Albuquerque had not challenged in its MTD.  See Tr. at 10:8-11:1 (Baker, Court).  The Court stated that it "doubt[ed] very seriously that the APD doesn't train its

---

[5]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

officer[s] to arrest people . . . on the basis of probable cause," and asked Griego how the City of Albuquerque had fostered a policy, custom, or practice of lacking probable cause.  Tr. at 12:12-14 (Court).  Griego responded that,

> clearly if they went to a scene and the man's arm was cut off and the woman was holding a [machete] I they would arrest the female, because there it's clear that there is probable cause and it's clear that the male has suffered the injury at the hands of the female.  So I'm not saying in every instance the male is arrested. What I'm saying is because they have a practice and a pattern of arresting men when they come to a scene, because there is an unwritten rule or an un written policy and a practice that someone is going to go, that therefore they make the decision to arrest the man in those circumstances.  And there is no supervision of these officers when they do it.  Because they're not properly trained in how to address the circumstances and determine who in fact.

Tr. at 13:6-22 (Baker).  The Court then asked the City of Albuquerque if it should dismiss Griego's failure-to-train and failure-to-supervise claims, given that he was alleging (i) an APD-wide policy of usually arresting males on domestic-violence calls; and (ii) a personal constitutional injury, in the form of Stockton arresting him without probable cause.  See Tr. at 18:18-22 (Court).  The City of Albuquerque conceded that Griego's claim was viable, if the Court read Griego's policy allegations broadly.  See Tr. at 18:23-24 (Dalton)("If the Court were to read the complaint that broadly yes, I would agree.").

The Court briefly addressed the failure-to-investigate claim, with the City of Albuquerque noting that it appeared to be without precedent, see Tr. at 21:18-23 (Dalton), the Court noting that a failure to investigate might form a viable claim if it led to an arrest without probable cause, but that such a claim would simply be for false arrest, see Tr. at 20:7-22 (Court), and Griego making a somewhat vague, legally unsourced argument for why the right to investigation is separate from the right to be free from unwarranted arrest, see Tr. at 22:2-23:9 (Baker).  The Court and the parties last discussed the equal-protection claim, with the City of Albuquerque focusing on the Complaint's failure to allege: (i) discriminatory intent or purpose;

- 14 -

or (ii) that a hypothetical, similarly situated female would be subject to different treatment. See Tr. at 26:3-23 (Dalton, Court). Griego focused heavily on the APD's refusal to allow him to attend a domestic-violence self-defense class, as well as the APD's purported unwritten policies of arresting men and favoring women during domestic-violence disputes. See Tr. at 31:4-33:6 (Baker, Court).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual

allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519

F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").  The defense of limitations is the affirmative defense most likely to be established by the uncontroverted facts in the complaint.  See 5 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure: Civil § 1277 (3d ed. 2014).  If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).  The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent upon the plaintiff to plead, either in the complaint or in amendments to it, facts establishing an exception to the affirmative defense).  It appears, from case law in several circuits, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by simply refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. New York, 186 F.3d 243,

251 (2d Cir. 1999); Honeycutt v. Mitchell, 2008 WL 3833472 (W.D. Okla. Aug. 15, 2008)(West, J.), although the Tenth Circuit has not squarely addressed this practice.

### LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).  The Supreme Court of the United States has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)("Because vicarious

liability is inapplicable to <u>Bivens</u>[6] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); <u>Bd. of Cnty. Comm'rs v. Brown</u>, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  <u>Garcia v. Casuas</u>, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing <u>Monell</u>, 436 U.S. 658, 689 (1978)).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  <u>See</u> <u>Barney v. Pulsipher</u>, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

      **1.**      **<u>Color of State Law.</u>**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed."  <u>Jojola v. Chavez</u>, 55 F.3d 488, 492 (10th Cir. 1995).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  <u>West v. Atkins</u>, 487 U.S. at 49 (quoting <u>United States v. Classic</u>, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."  <u>Jojola v. Chavez</u>, 55 F.3d at 493.  Accordingly, at a base level, to find that an action was taken

---

[6]In <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'"  Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmondson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.  Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(citations omitted) (quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2.     Individual Liability.

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing

the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell, 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations.  The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).[7]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995).  "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."  72 F.3d at 400.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d

---

[7]The Court clarified in Herrera v. Santa Fe Public Schools that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit."  41 F. Supp. 3d 1188, 1273 (D.N.M. Aug. 29, 2014)(Browning, J.).

1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987),
abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701
(1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment,

the Tenth Circuit has held that government actors "may be held liable if the further unlawful

detention and arrest would not have occurred but for their conduct and if there were no

unforeseeable intervening acts superseding their liability."  Martinez v. Carson, 697 F.3d at

1255.  The Tenth Circuit gave an example of a superseding-intervening cause, quoting the

Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of

Appeals for the Third Circuit:

> Suppose that three police officers go to a suspect's house to execute an
> arrest warrant and that they improperly enter without knocking and announcing
> their presence.  Once inside, they encounter the suspect, identify themselves,
> show him the warrant, and tell him that they are placing him under arrest.  The
> suspect, however, breaks away, shoots and kills two of the officers, and is
> preparing to shoot the third officer when that officer disarms the suspect and in
> the process injures him.  Is the third officer necessarily liable for the harm caused
> to the suspect on the theory that the illegal entry without knocking and
> announcing rendered any subsequent use of force unlawful?  The obvious answer
> is "no."  The suspect's conduct would constitute a "superseding" cause, see
> Restatement (Second) of Torts § 442 (1965), that would limit the officer's
> liability.  See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally,

"[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047 (quoting William

Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed.1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in
> determining whether the intervening act relieves the actor from liability for his
> antecedent wrongful act, and under the undisputed facts there is room for
> reasonable difference of opinion as to whether such act was wrongful or
> foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt.b (1965)).

3.      **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'"  Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(alterations omitted).  Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."  Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses

- 23 -

> responsibility for the continued operation of a policy the enforcement (by the
> defendant-supervisor or her subordinates) of which "subjects, or causes to be
> subjected" that plaintiff "to the deprivation of any rights . . . secured by the
> Constitution . . . ."

614 F.3d at 1199.  The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule

existing Supreme Court precedent," but stated that "Iqbal may very well have abrogated § 1983

supervisory liability as we previously understood it in this circuit in ways we do not need to

address to resolve this case." Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft

v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal

involvement analysis." Dodds v. Richardson, 614 F.3d at 1200.  The Tenth Circuit, based on this

conclusion, set forth a test for supervisory liability under § 1983 after Ashcroft v. Iqbal:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by
> demonstrating: (1) the defendant promulgated, created, implemented or possessed
> responsibility for the continued operation of a policy that (2) caused the
> complained of constitutional harm, and (3) acted with the state of mind required
> to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995,

1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these

are distinct analytical prongs, never to be intertwined." Dodds v. Richardson, 614 F.3d at 1200

n.8.  Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, the

Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the

third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal
> law, or directs an employee to do so, resolving these issues of fault and causation
> is straightforward.  Section 1983 itself contains no state-of-mind requirement
> independent of that necessary to state a violation of the underlying federal right.
> In any § 1983 suit, however, the plaintiff must establish the state of mind required
> to prove the underlying violation.  Accordingly, proof that a municipality's
> legislative body or authorized decisionmaker has intentionally deprived a plaintiff
> of a federally protected right necessarily establishes that the municipality acted
> culpably.  Similarly, the conclusion that the action taken or directed by the

municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

### 4.        **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

Establishing an informal policy or custom requires the plaintiff to show that the misconduct was "widespread" -- i.e., that it involved a "series of decisions."  City of St. Louis v.

- 25 -

Praprotnik, 485 U.S. 112, 127 (1988).  Although the existence or nonexistence of such a policy,

practice, or custom is a question of fact for the jury, see Powers v. Hamilton Cnty. Pub. Defender

Comm'n, 501 F.3d 592, 599 (6th Cir. 2007)("[T]he evidence showed at least a disputed question

of fact as to the existence of its alleged policy or custom . . . ."); Surprenant v. Rivas, 424 F.3d 5,

21 (1st Cir. 2005)("O'Mara challenges the very existence of the interdicted policy, custom, or

practice.  Proving the existence of a policy, custom, or practice normally entails questions of

fact."  (citation omitted)); Wallis v. Spencer, 202 F.3d 1126, 1136 (9th Cir. 1999)("In order to

avoid summary judgment, a plaintiff need only show that there is a question of fact regarding

whether there is a city custom or policy that caused a constitutional deprivation."); Gregory v.

City of Rogers, Ark., 921 F.2d 750, 757 (8th Cir. 1990)("[A]ppellants have raised material

questions of fact whether it was the custom of the Rogers Police Department that officers could

use their discretion in deciding whether or not to arrest intoxicated individuals, despite the state

statute requiring their arrest."); Fancher v. Barrientos, No. CIV 11-0118 LH/LAM, 2013 WL

8600085, at *4 (D.N.M. Aug. 19, 2013)(Hansen, J.)("[A]t this time the record is unclear and it

remain a question of fact as to which policy was in place."); Jacobs v. Dujmovic, 752 F. Supp.

1516, 1525 (D. Colo. 1990)("[T]he Jacobs have failed to meet their summary judgment burden

of showing that it adopted a policy, custom or procedure that caused constitutional violations, or

that there is a question of fact as to the existence of such a policy."), it is not a fact that can be

baldly asserted at the pleading stage, see Young v. City of Albuquerque, No. CIV 13-1046

JB/RHS, 2014 WL 7473806, at *27 (D.N.M. Dec. 24, 2014)(Browning, J.); Atwell v. Gabow,

Nos. CIV 06-2262, 07-2063 JLK, 2008 WL 906105, at *6 (D. Colo. Mar. 31, 2008)(Kane, J.).

Pleading a municipal policy, custom, or practice is like pleading the breach element of

negligence -- which is also ultimately a question of fact for the jury.  The plaintiff cannot simply

allege that there is a policy in place, but, rather, must plead facts that, if true, would give rise to a plausible inference that such a policy exists.  With formal or written policies, satisfying this pleading standard is easy; the plaintiff can simply allege what the policy is and where it is codified.  With informal, unwritten policies, customs, or practices, the plaintiff can plead either a pattern of multiple similar instances of misconduct -- no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible -- or use other evidence, such as a police officers' statements attesting to the policy's existence.  The Tenth Circuit has not explicitly held as much, but they have implied that district court's should analyze policies, practices, or customs under Monell as "legal conclusions" at the pleading stage -- which must be supported by facts, rather than conclusorily alleged -- and not "facts" in and of themselves, to be taken as true at face value:

> [T]he complaint alleges that the City of Denver Police Department had an official policy and plan to repress, vilify, and deny rights to Mexicanos, American Indians, and other "oppressed" national minorities, and that, pursuant to that plan, the Department formulated and issued a "get Martinez" policy and instructions. In furtherance of that policy, we are told, the Department kept a dossier on plaintiff, including reports, recordings, and other materials concerning his views, associations, and meetings.  The Department also entered into a campaign to charge plaintiff and harass him and others advocating unpopular causes with unfounded prosecutions and to discourage him and others from asserting their rights.  In or about October 1973, we are told, the Department, because of racial hatred and in order to chill the assertion of rights, obtained a warrant for the false and unfounded arrest of plaintiff, and, in or about November 1973, the Department "determined, in furtherance of its policy . . . as aforestated, to issue an order to all Denver Police Officers to 'shoot on sight' plaintiff."
>
> We think these allegations are clearly sufficient, as a matter of pleading, to satisfy the "policy" or "custom" requirement of Monell.

Martinez v. Winner, 771 F.2d 424, 443-44 (10th Cir. 1985)(citations to the complaint omitted).

If a conclusory assertion that the Denver Police Department had such a policy in place would

have sufficed to clear the rule 12(b)(6) bar, the Court sees little reason for the Tenth Circuit to have gone into this detailed recitation.  The United States Courts of Appeals for the Seventh and Ninth Circuits have addressed this question squarely, and both have come down on the side that Monell policies must be supported by factual allegations giving rise to an inference that the policies exist.  See McCauley v. City of Chicago, 671 F.3d 611, 618 (7th Cir. 2011)("In order to state a facially plausible equal-protection claim under Monell, the factual allegations in McCauley's complaint must allow us to draw the reasonable inference that the City established a policy or practice . . . ."); Svastics v. City of Beverly Hills, 178 F.3d 1300, at *1 (9th Cir. May 14, 1999)(unpublished)("The district court also properly dismissed the claims against the City because any allegations of an unconstitutional custom or policy, even after amendment of the complaint, remained too conclusory to support a claim pursuant to Monell."); Strauss v. City of Chicago, 760 F.2d 765, 767 (7th Cir. 1985)("A complaint that tracks Monell's requirement of official policy with bare allegations cannot stand . . . .  The absence of any facts at all to support plaintiff's claim renders the allegations mere legal conclusions of Section 1983 liability devoid of any well-pleaded facts . . . ."  (footnote omitted)); Powe v. City of Chicago, 664 F.2d 639, 650 (7th Cir. 1981)("[T]he mere allegation of a single act of unconstitutional conduct by a municipal employee will not support the inference that such conduct was pursuant to official policies.  On the other hand, where the plaintiff alleges a pattern or a series of incidents of unconstitutional conduct, then the courts have found an allegation of policy sufficient to withstand a dismissal motion.").  The three district courts in the Tenth Circuit -- including the Court -- to have addressed the issue agree.  In Atwell v. Gabow, the Honorable Thomas K. Kane, United States District Judge for the District of Colorado, dismissed a series of Monell claims on this ground:

> From the inception of this litigation, I have admonished counsel regarding the import of Monell and its progeny for Plaintiffs' municipal liability claims and

have explicitly ordered them to identify "***specific factual allegations*** supporting the conclusory allegations in the First Amended Complaint that Denver Health and/or Defendant Gabow acting in her official capacity made a policy decision, or engaged in a custom or practice of discrimination, for purposes of municipal liability.

. . . .

Plaintiffs do not identify a custom, policy or practice applicable to all of them that would render Denver Health liable under Monell for the discrimination each claims to have suffered, and none pleads actual facts giving rise to a plausible inference that such a policy, custom or practice existed. Simply aggregating eight individual claims and calling them the result of a "custom or policy of discrimination" is insufficient, as are all of the other conclusory recitations of Canton or similar legal standards as "facts" supporting municipal liability. Plaintiffs' 42 U.S.C. §§ 1981 and 1983 claims against Denver Health or Gabow, Rossman and Alexander in their "official capacities" are therefore DISMISSED.

2008 WL 906105, at *6, *8 (emphasis in original). In Granato v. City and County of Denver, No. CIV 11-0304 MSK/BNB, 2011 WL 3820730 (D. Colo. Aug. 20, 2011), the Honorable Marcia S. Krieger, now-Chief United States District Judge for the District of Colorado, ruled similarly:

At a minimum, a party asserting a Monell claim must plead sufficient facts to identify the unconstitutional custom or policy that was promulgated and the means by which that custom or policy caused the constitutional violation.

Here, Ms. Granato's allegations of an unconstitutional custom or policy maintained by Denver Health are entirely conclusory. She offers only the "formulaic recitation" of a Monell claim, alleging that Mr. Khazanov "act[ed] and/or fail[ed] to act pursuant to City or State policy, custom, decision, ordinance, regulation, habit, usage or practice in [his] conduct," but never identifies precisely what particular custom or policy of Denver Health Mr. Khazanov was acting pursuant to . . . . As cases like Twombly and Iqbal make clear, such conclusory pleadings are insufficient to state a claim. Accordingly, Denver Health is entitled to dismissal of the Monell claim against it.

2011 WL 3820730, at *8 (alterations in original)(footnote omitted)(citation omitted). Last, in Young v. City of Albuquerque, the Court dismissed a plaintiff's Monell claims on the same basis:

- 29 -

> [F]ar from asserting that the misconduct in this case was widespread, Young has not alleged any facts -- such as statistics, records of complaints filed with the city, or even anecdotal evidence -- that would indicate that the misconduct alleged in this case was more than an isolated incident.  In fact, Young cannot point to another instance in which a City of Albuquerque employee has deprived another individual of his or her property rights without due process.  A single incident is insufficient to establish the existence of a custom or practice.  See City of St. Louis v. Praprotnik, 485 U.S. at 127 (explaining that a custom requires that the alleged misconduct is "widespread" -- i.e., involving a "series of decisions").

2014 WL 7473806, at *27.  These cases all stand for the same thing: at the pleading stage, the existence of a Monell policy is a "conclusion" to be built up to, rather than a "fact" to be baldly asserted.

When there is no formal written policy and the § 1983 plaintiff is relying upon a practice or custom, some courts appear to look for a specific number of prior similar incidents -- often saying that two or three instances will not suffice.  See Wilson v. Cook Cnty., 742 F.3d 775, 780 (7th Cir. 2014)("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident -- or even three incidents -- do not suffice."); Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996)(holding that two instances of misconduct "do not indicate a 'persistent and widespread' pattern of misconduct that amounts to a city custom or policy of overlooking police misconduct"); Eugene v. Alief Ind. Sch. Dist., 65 F.3d 1299, 1304 (5th Cir. 1995)(holding that two incidents of alleged excessive force are insufficient to show policy or custom).  Other courts require only that the plaintiff plead that the policy exists, reasoning that the usual rule of pleading -- that courts are to accept all allegations as true at the motion-to-dismiss stage -- applies in the context of pleading a Monell policy, practice, or custom.  See Bartholomew v. Fischl, 782 F.2d 1148, 1152-53 (3d Cir. 1986)(holding that a plaintiff who pleaded "'a single instance of illegality'" had nonetheless sufficiently "pleaded the existence of an official policy or official conduct sufficient to support

municipal liability"); <u>Estate of Bailey by Oare v. York Cnty.</u>, 768 F.2d 503, 506-07 (3d Cir. 1985)(holding that courts are to accept allegations in the complaint as being true, including <u>Monell</u> policies, and writing that "a federal court reviewing the sufficiency of a complaint has a limited task").[8]  The Court does not believe a pre-determined numerical pleading standard is best, nor does the Court think that pleading the facts of the plaintiff's individual case and adding the conclusion "policy, practice, or custom" suffice.  The plaintiff must plead what he or she knows -- whether it is a number of incidents or some other evidence -- that renders plausible the plaintiff's conclusion that there is a policy, custom, or practice in place.  If a police officer says there is a policy, that allegation may be enough to plausibly suggest that the policy exists, even if the plaintiff can plead only one specific instance of conduct.  If a police officer says he or she was told to do something down at the stationhouse, that allegation, too, may be enough.  The expectation is that the plaintiff must tell the Court at the outset, in the complaint, (i) why he or she thinks a policy exists -- alleging specific facts; and (ii) what he or she thinks the policy is. The Court will then decide whether (i) plausibly suggests (ii).  The plaintiff must tell the Court, however, what he or she has, or else the Court will disregard the alleged policy as a naked conclusion.

## <u>LAW REGARDING QUALIFIED IMMUNITY</u>

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  <u>Roybal v. City</u>

---

[8]These cases -- in addition to being from the United States Court of Appeals for the Third Circuit -- were decided well before <u>Bell Atlantic Corp. v. Twombly</u> and <u>Ashcroft v. Iqbal</u>.

of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economu, 438 U.S. 478, 504 (1978).  "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights.  But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. at 232 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)).  "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457

U.S. at 818).   Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001).  When a defendant asserts qualified immunity, the plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

### 1.     Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct.

2088, 2093 (2012)(affirming Pearson v. Callahan's precedent and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily"). Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails. See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases;" (ii) "it appears that the question will soon be decided by a higher court;" (iii) deciding the constitutional question requires "an uncertain interpretation of state law;" (iv) "qualified immunity is asserted at the pleading stage" and "the precise factual basis for the . . . claim . . . may be hard to identify;" (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question, because "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d at 1180-81 (quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern where guidance on the constitutionality of the challenged conduct is necessary and the conduct is only likely to face

challenges in the qualified immunity context. Camreta v. Greene, 131 S. Ct. at 2031-32. See Kerns v. Bader, 663 F.3d at 1181. "Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 131 S. Ct. at 2080 (quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)). See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones."). Cf. Glover v. Gartman, No. CIV 11-0752 JB/LAM, 2012 WL 4950756, at *30 n.5 (D.N.M. Sept. 27, 2012)(Browning, J.)(expressing concern regarding Justice Elena Kagan's comments about "large" and "small" cases, and noting that, as a trial court judge, the Court must both find the law and facts correctly and accurately, but must also give its attention and time to each litigant before the Court). The Tenth Circuit will remand a case to the district court for further consideration when the district court has given cursory treatment to the qualified immunity issue. See Kerns v. Bader, 663 F.3d at 1182.

## 2. Clearly Established Rights in the Qualified Immunity Analysis.

In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right. See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007). "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)[9](quoting Zweibon v. Mitchell, 720 F.2d 162,

---

[9]Lobozzo v. Colorado Department of Corrections is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the

172-73 (D.C. Cir. 1983)).  "Ordinarily, in order for the law to be clearly established, there must

be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of

authority from other courts must have found the law to be as the plaintiff maintains."  Currier v.

Doran, 242 F.3d 905, 923 (10th Cir. 2001).  See Medina v. City & Cnty. of Denver, 960 F.2d

1493, 1498 (10th Cir. 1992).  On the other hand, the Supreme Court has observed that it is

generally not necessary to find a controlling decision declaring the "very action in

question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining

whether the right was 'clearly established,' the court assesses the objective legal reasonableness

of the action at the time of the alleged violation and asks whether 'the contours of the right

[were] sufficiently clear that a reasonable official would understand that what he is doing

violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir.

2001)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put

officials on fair notice that the described conduct was unconstitutional" rather than engage in "a

scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279, 1298

(10th Cir. 2004).

---

case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential,
but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its
> disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Lobozzo v.
Colorado Department of Corrections, Teigen v. Renfrow, 511 F.3d 1072 (10th Cir. Dec. 27,
2007)(unpublished), and McCrary v. Aurora Public Schools, 57 F. App'x 362 (10th Cir.
2003)(unpublished), have persuasive value with respect to a material issue, and will assist the
Court in its disposition of this Memorandum Opinion.

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."   Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).  While a case directly on point is not required, the Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate."  Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 131 S. Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs," as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader, that although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general

privacy interest in our home," but "whether it was <u>beyond debate</u> in 2005 that the officers' entry and search lacked legal justification." <u>Kerns v. Bader</u>, 663 F.3d at 1183 (emphasis added). Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established. <u>See</u> <u>Casey v. City of Fed. Heights</u>, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."). "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law." <u>Casey v. City of Fed. Heights</u>, 509 F.3d at 1284. Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ." <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002).

## 3.     <u>Pleading Allegations in the Face of Qualified Immunity.</u>

A plaintiff must plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The "degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context: . . . . Fair notice under Rule 8(a)(2) depends on the type of case." <u>Robbins v. Oklahoma</u>, 519 F.3d 1242, 1248 (10th Cir. 2008)(citing <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 231-232 (3d Cir. 2008). Although the same standard applies "in evaluating dismissals in qualified immunity cases as to dismissals generally, complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants." <u>Robbins v. Oklahoma</u>, 519 F.3d at 1249 (quoting <u>Shero v. City of Grove</u>, 510 F.3d 1196, 1200 (10th Cir.

1997))(internal quotations omitted).  The Tenth Circuit has articulated the standard required to give adequate notice to government actors sued in their individual capacities under § 1983:

> In § 1983 cases, defendants often include the government agency and a number of government actors sued in their individual capacities.  Therefore, it is particularly important in such circumstances that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.

Robbins v. Oklahoma, 519 F.3d at 1249-1250 (emphasis in original).

## LAW REGARDING MALICIOUS ABUSE OF PROCESS UNDER NEW MEXICO STATE LAW

New Mexico has combined the torts of abuse of process and malicious prosecution into a single tort: malicious abuse of process.  See DeVaney v. Thriftway Mktg. Corp., 1998-NMSC-001, ¶ 17, 953 P.2d 277, 283 (N.M. 1997), overruled by Durham v. Guest, 2009-NMSC-007, 204 P.3d 19 (N.M. 2009).  "One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process."  Richardson v. Rutherford, 1990-NMSC-015, ¶ 21, 787 P.2d 414, 420 (N.M. 1990).  The Supreme Court of New Mexico has held that

> an abuse of process arises when there has been a perversion of the court processes to accomplish some end which the process was not intended by law to accomplish, or which compels the party against whom it has been used to perform some collateral act which he legally and regularly would not be compelled to do.

Richardson v. Rutherford, 1990-NMSC-015, ¶ 18, 787 P.2d at 419.

The Supreme Court of New Mexico recently revised the necessary elements of the tort of malicious abuse of process.  In Durham v. Guest, the Supreme Court of New Mexico held that: (i) an arbitration proceeding is a judicial proceeding for the purposes of a claim for malicious abuse of process, see 2009-NMSC-007, ¶ 35, 204 P.3d at 28; and (ii) that the requirement that the defendant initiate judicial proceedings against the plaintiff -- which had previously been an

- 39 -

essential element to a malicious-abuse-of-process claim -- was no longer an element, see 2009-NMSC-007, ¶ 28, 204 P.3d at 26. The tort of malicious abuse of process under New Mexico law now has only three elements: (i) "the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge;" (ii) "a primary motive in the use of process to accomplish an illegitimate end;" and (iii) damages. Durham v. Guest, 2009-NMSC-007, ¶ 29, 204 P.3d at 26.

> In elaborating upon the first element, the Supreme Court of New Mexico commented:
>
> An improper use of process may be shown by (1) filing a complaint without probable cause, or (2) an irregularity or impropriety suggesting extortion, delay, or harassment, or other conduct formerly actionable under the tort of abuse of process. A use of process is deemed to be irregular or improper if it (1) involves a procedural irregularity or a misuse of procedural devices such as discovery, subpoenas, and attachments, or (2) indicates the wrongful use of proceedings, such as an extortion attempt. Finally, we emphasize that the tort of malicious abuse of process should be construed narrowly in order to protect the right of access to the courts.

2009-NMSC-007, ¶ 29, 204 P.3d at 26. About the general policies underlying the malicious-abuse-of-process tort, the Supreme Court said:

> When the judicial process is used for an illegitimate purpose such as harassment, extortion, or delay, the party that is subject to the abuse suffers harm, as does the judicial system in general. Thus, the malicious abuse of process tort makes the process abuser liable to the other party for the harm caused by the abuse of process.

2009-NMSC-007, ¶ 31, 204 P.3d at 27. The tort of malicious abuse of process is construed narrowly to protect the right of access to the courts. See DeVaney v. Thriftway Mktg. Corp., 1998-NMSC-001, ¶ 19, 953 P.2d at 284. "[T]he filing of a proper complaint with probable cause, and without any overt misuse of process, will not subject a litigant to liability for malicious abuse of process, even if it is the result of a malicious motive." DeVaney v. Thriftway Mktg. Corp., 1998-NMSC-001, ¶ 20, 953 P.2d at 285. See Richardson v. Rutherford, 1990-

NMSC-015, ¶ 23, 787 P.2d at 421 ("There is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions . . . ." (citation omitted)).   "[A] malicious-abuse-of-process plaintiff attempting to show a lack of probable cause must demonstrate, by the applicable standard of proof, that the opponent did not hold a reasonable belief in the validity of the allegations of fact or law of the underlying claim."  DeVaney v. Thriftway Mktg. Corp., 1998-NMSC-001, ¶ 27, 953 P.2d at 287. If an officer had probable cause to obtain the warrant for the plaintiff's arrest, then he acted with authority when he arrested her, and he cannot be held liable for malicious abuse of process based on a lack of probable cause, but can still be held liable under a "procedural impropriety" theory. Santillo v. N.M. Dep't of Pub. Safety, 2007-NMCA-159, ¶ 26, 173 P.3d 6, 13-14 (N.M. 2007) (noting that "the procedural impropriety theory, unlike the lack of probable cause theory, does not stand or fall on the merits of the underlying claims," and that "even in meritorious cases the legal process may be abused").

## LAW REGARDING EQUAL-PROTECTION CLAIMS

The Equal Protection Clause of the Fourteenth Amendment guarantees that "no states shall . . . deny to any person within the jurisdiction to the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "The Equal Protection Clause 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'"  Soskin v. Reinertson, 353 F.3d 1242, 1247 (10th Cir. 2004)(quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).  See Corder v. Lewis Palmer Sch. Dist. No. 38, 566 F.3d 1219, 1233 (10th Cir. 2009)("Equal protection 'is essentially a direction that all persons similarly situated should be treated alike.'") (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).  "The Clause 'creates no substantive rights.  Instead, it embodies a general rule that States must treat like cases

alike but may treat unlike cases accordingly.'" Teigen v. Renfrow, 511 F.3d 1072, at *8 (10th

Cir. Dec. 27, 2007)(unpublished)(quoting Vacco v. Quill, 521 U.S. 793,799 (1997)).   "In

disparate-treatment discrimination suits, the elements of a plaintiff's case are the same whether

that case is brought under §§ 1981 or 1983 or Title VII." Etsitty v. Utah Transit Auth., 502 F.3d

1215, 1227 (10th Cir. 2007)(quoting Maldonado v. City of Altus, 433 F.3d 1294, 1307 (10th Cir.

2006), overruled on other grounds, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53

(2006)).

Generally, to state a claim under § 1983 for violation of the Equal Protection Clause, the

plaintiff must show the defendant acted under color of law and discriminated against him or her:

> To succeed [on an equal employment action, a plaintiff] must show that (1) she
> was deprived of a right arising under the United States Constitution or federal
> law, and (2) the offending party acted under the color of state law.   Neither the
> City nor anyone else disputes that the Department was acting under color of state
> law at all relevant times.   Instead, the City contends that Lewallen has failed to
> prove that the Department violated her Equal Protection rights.   To succeed on
> this claim, Lewallen had to show that (1) she suffered an adverse employment
> action, (2) it was based on sex discrimination, and (3) a policy or custom of the
> City was the motivating force behind that sex-based adverse action.

Lewallen v. City of Beaumont, 394 F. App'x 38, 42-43 & n.13 (5th Cir. 2010).

A state actor can generally be subject to liability only for its own conduct under

42 U.S.C. § 1983.   See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago

Cnty. Dep't of Soc. Servs., 489 U.S. at 197, 109 S.Ct. 998).   At least in the Tenth Circuit,

however, under some circumstances, harassment by a third-party can subject a supervisor or

municipality to liability for violation of the equal-protection clause -- not for the harasser's

conduct, per se, but for failure to take adequate steps to stop it.   See Murrell v. Sch. Dist. No. 1,

186 F.3d at 1249-51 (discussing one student's sexual harassment of another and stating that

"sexual harassment by a state actor can constitute a violation of the equal protection clause").  To

state such a claim, the plaintiff

> must demonstrate that a state employee's discriminatory actions are representative
> of an official policy or custom of the municipal institution, or are taken by an
> official with final policy making authority.  To subject a governmental entity to
> liability, "a municipal policy must be a 'policy statement, ordinance, regulation,
> or decision officially adopted and promulgated by [a municipality's] officers.'"
> Absent such an official policy, a municipality may also be held liable if the
> discriminatory practice is "so permanent and well settled as to constitute a
> 'custom or usage' with the force of law."

Murrell v. Sch. Dist. No. 1, 186 F.3d at 1249 (citations omitted).  Nevertheless, the Tenth Circuit

has stated that "a failure to prevent sexual harassment by a student *before it occurs* does not

violate . . . the  Fourteenth  Amendment  absent  a  showing  of  an  institutional  policy  of

indifference. However, a refusal to remedy known sexual harassment is actionable."  Murrell v.

Sch. Dist. No. 1, 186 F.3d at 1250 n.9 (emphasis in original).  Finally,

> [t]he party alleging discrimination has the burden of proving that the state's
> conduct was motivated by a discriminatory purpose.  See Whitus v. Georgia, 385
> U.S. 545 (1967)(explaining that "[t]he burden is, of course, on the petitioners to
> prove  the  existence  of  purposeful  discrimination");  Sauers v. Salt Lake Cnty.,
> 1 F.3d 1122, 1130 (10th Cir. 1993)(stating that "[a] plaintiff in an equal protection
> action has the burden of demonstrating discriminatory intent.").  It is "hornbook
> constitutional law that mere negligence or mistake resulting in uneven application
> of the law is not an equal protection violation."  Roe v. Keady, 329 F.3d 1188,
> 1191-92 (10th Cir. 2003).

Bell v. Bd. of Educ. of the Albuquerque Pub. Sch., No. CIV 06-1137 JB/ACT, 2008 WL

4104118, at *15 (D.N.M. May 6, 2008)(Browning, J.).

On the other hand, to hold a supervisory employee liable in his or her individual capacity

for sexual harassment conducted by a third party, the plaintiff must show "deliberate indifference

to known . . . harassment."  Murrell v. Sch. Dist. No. 1, 186 F.3d at 1250.  "Liability under

§ 1983 must be predicated upon a 'deliberate' deprivation of constitutional rights by the

defendant and not upon mere negligence."  Murrell v. Sch. Dist. No. 1, 186 F.3d at 1250

- 43 -

(quoting Woodward v. City of Worland, 977 F.2d 1392, 1399 (10th Cir. 1992))(alterations omitted). To show that the supervisory employee's conduct was "deliberate" the plaintiff must "state facts sufficient to allege 'defendants actually knew of and acquiesced in' [the third-party's] behavior." Murrell v. Sch. Dist. No. 1, 186 F.3d at 1250.

To prevail on an Equal Protection claim, a plaintiff must show that he or she was subjected to an adverse employment action. Courts use the same standard for adverse employment actions under Equal Protection claims and Title VII claims. In McCrary v. Aurora Public Schools, 57 F. App'x 362 (10th Cir. 2003)(unpublished), after holding that the plaintiff's ADEA and ADA claims failed because the she failed to show she was subject to an adverse employment action, the Tenth Circuit summarily dismissed her Equal Protection claim:

> As to Ms. McCrary's claim that her right to equal protection was violated when she was not considered for a fourth-grade classroom position and instead was transferred to a CST position, we have already concluded that neither of those actions constituted an adverse employment action [under the ADA or the ADEA], and Ms. McCrary has not otherwise shown that they gave rise to an injury for purposes of § 1983.

57 F. App'x at 373. See, e.g., Lewallen v. City of Beaumont, 394 F. App'x 38, 43 & n.13 (5th Cir. 2010)(stating that, in the equal-protection context, "[s]tanding alone, the denial of a lateral transfer cannot constitute an adverse employment action")(citing Burger v. Cent. Apartment Mgmt., Inc., 168 F.3d 875, 879 (5th Cir. 1999)(Title VII case); Williams v. N.Y.C. Housing Auth., 335 F. App'x 108, 110 (2d Cir. 2009))("Neither NYCHA's denial of Williams's request for a leave of absence, nor its deduction of a small amount from her salary, nor its issuance of two counseling memoranda constituted an adverse employment action.")(citing Weeks v. N.Y. State (Div. of Parole), 273 F.3d 76, 86 (2d Cir. 2001))(addressing adverse employment actions in the Title VII context), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 108-14 (2002); Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 641 (2d Cir. 2000)

(noting that the alleged adverse action in ADEA case must result in a "change in responsibilities so significant as to constitute a setback to plaintiff's career"); <u>Crawford v. Carroll</u>, 529 F.3d 961, 970 (11th Cir. 2008)("These elements also apply to a [equal-protection] claim of race discrimination under § 1983 because the analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same."); <u>Watson v. City of Cleveland</u>, 202 F. App'x 844, 856 (6th Cir. 2006)("Proving intentional discrimination for an equal protection claim brought under § 1983 requires the plaintiff to make the same showing required to prove a violation of Title VII." (citing <u>Gutzwiller v. Fenik</u>, 860 F.2d 1317, 1325 (6th Cir. 1988))); <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 225 (2d Cir. 2004)(noting that substantive standards for claims under Title VII also apply to discrimination claims under the Equal Protection Clause); <u>Herts v. Smith</u>, 345 F.3d 581, 588 (8th Cir. 2003) ("To make out a prima facie case of discrimination under the Equal Protection Clause of the Fourteenth Amendment, or under Title VII, a plaintiff need show only that she is a member of a protected class, was qualified for her position, and suffered an adverse employment action."). <u>See also</u> <u>McPhaul v. Bd. of Com'rs of Madison Cnty.</u>, 226 F.3d 558, 566 n.6 (7th Cir. 2000) ("Because section 1983 claims generally follow 'the contours of Title VII claims,' we will apply the same 'hostile environment' standard that is applied in Title VII cases." (citing <u>King v. Bd. of Regents of Univ. of Wis. Sys.</u>, 898 F.2d 533, 537 (7th Cir. 1990))).

## <u>ANALYSIS</u>

The Court will dismiss Griego's failure-to-investigate claim with prejudice, and his equal-protection and failure-to-train-or-supervise claims without prejudice. Griego cannot sustain a failure-to-investigate claim, because he has no constitutional or federal-statutory right -- let alone a clearly established one -- to police investigation. The other two claims fail because

Griego has insufficiently plead the existence of a policy, practice, or custom, as <u>Monell</u> requires. He pleads the policy as a bald, conclusory allegation, and fails to plead facts that give rise to a plausible inference that the policy exists.  If Griego amends his Complaint to add allegations that plausibly suggest the policy he alleges -- that the APD is encouraged to over-arrest on domestic-violence calls, and to usually arrest the man rather than the woman -- then both of these claims can likely survive the motion-to-dismiss stage.  Griego has sufficiently alleged a constitutional injury -- being arrested without probable cause -- and a causal link between the injury and the policy -- that Stockton arrested him pursuant to the policy of arresting men at domestic-violence calls -- and, thus, if he fixes his Complaint to properly allege the policy itself, his claim should survive a subsequent motion to dismiss.   The equal-protection claim is in the same boat; if Griego can properly allege the policy, the policy itself appears to plausibly have both a discriminatory purpose and a discriminatory impact.

## I.     THE COURT WILL DISMISS GRIEGO'S SIXTH CLAIM -- FOR FAILURE TO INVESTIGATE -- WITH PREJUDICE, BECAUSE THERE IS NO INDEPENDENT RIGHT TO POLICE INVESTIGATION.

Griego concedes in his Response that "'there is no general constitutional right to police protection.'"  Response at 9 (quoting <u>Watson v. City of Kansas City, Kan.</u>, 857 F.2d at 694 (10th Cir.)).  A police officer might conceivably violate the Fourth Amendment by failing to properly investigate a crime, but the officer's failure to investigate would be the deliberately blind means to an unconstitutional end -- not an unconstitutional end in itself.  For example, if an officer were to arrest a suspect for shoplifting as she leaves a department store and detain her without checking with the cashier to see whether she, in fact, paid for the item, that omission might give rise to a colorable § 1983 claim.  <u>See</u> <u>Baptiste v. J.C. Penney Co.</u>, 147 F.3d 1252, 1254-55, 1259 (10th Cir. 1998)("[P]olice officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based

on that investigation.").  That claim, however, would be for false arrest -- an arrest without probable cause -- because an officer cannot rack up one-sided evidence to support probable cause while willfully blinding himself to obvious exculpatory evidence within arm's reach.  See Cortez v. McCauley, 478 F.3d 1108, 1119 (10th Cir. 2007)("[A] bare allegation of wrongdoing, without any investigation, in some circumstances, may not give rise to probable cause."); Romero v. Fay, 478 F.3d 1472, 1476-77 (10th Cir. 1995)("[T]he probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." (emphasis added)).  Griego alleges such a claim, see Complaint ¶¶ 44-52, 12-13, and it is not the same thing as a claim seeking redress for, in itself, an officer's failure to properly investigate an alleged crime.

The case law that exists is unkind even to the failure-to-investigate theory for making out a false-arrest claim; there is no case law supporting an independent failure-to-investigate claim. "[T]he failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth.  To the contrary, it is generally considered to betoken negligence at most."  Stonecipher v. Valles, 759 F.3d 1134, 1142 (10th Cir. 2014).  See Romero v. Fay, 45 F.3d 1472 (10th Cir.)(holding that officers' failure to talk to asserted alibi witnesses did not constitute a violation of the defendant's constitutional rights).  In domestic-violence situations in particular, there are often difficult credibility determinations, and officers on the scene are not required to sort out those issues just to stay within constitutional bounds.  See United States v. Patane, 304 F.3d 1013, 1016-17 (10th Cir. 2002), rev'd on other grounds, 542 U.S. 630 (2004).

There is no constitutional or federal-statutory right to have police conduct a full, proper, or even competent investigation. Even if such a right existed -- and the Court concludes it does not -- it would not be clearly established, and Stockton and the City of Albuquerque would be entitled to qualified immunity. The Court will, therefore, dismiss Griego's sixth claim.

## II.   THE COURT WILL DISMISS GRIEGO'S FIFTH CLAIM -- FOR FAILURE TO SUPERVISE OR TRAIN -- WITHOUT PREJUDICE, BECAUSE HE HAS NOT ALLEGED FACTS THAT GIVE RISE TO A PLAUSIBLE INFERENCE THAT THE APD HAS A POLICY, PRACTICE, OR CUSTOM IN PLACE.

Griego's fifth claim is alleged only against the City of Albuquerque -- and not against any specific individual in the APD hierarchy -- and, thus, to establish liability, he must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged. See Graves v. Thomas, 450 F.3d at 1218. When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to its inhabitants' rights. See Graves v. Thomas, 450 F.3d at 1218. See also Collins v. City of Harker Heights, Tex., 503 U.S. 115, 124 (1992)("[T]he inadequate training of police officers could be characterized as the cause of the constitutional tort if -- and only if -- the failure to train amounted to 'deliberate indifference' to the rights of persons with whom the police come into contact."). Here, the underlying constitutional violation is an arrest without probable cause, the municipal policy, practice, or custom is one of always making an arrest -- usually of the man -- on domestic-violence calls, and the direct causal link between them came when Stockton arrested Griego pursuant to this policy rather than on the basis of particularized probable cause. Griego's Complaint fails on the second prong; he does not plausibly allege the policy, custom, or practice that he conclusorily asserts.

Taking the prongs in turn, Griego argues that the constitutional violation that the APD's policy caused was his false arrest.  See Tr. at 10:2-20 (Court, Baker).  The touchstone of a false-arrest allegation is the absence of probable cause.  See Kaufman v. Higgs, 697 F.3d 1297, 1300 (10th Cir. 2012)("In the context of a false arrest claim, an arrestee's constitutional rights were violated if the arresting officer acted in the absence of probable cause that the person had committed a crime."  (citation omitted)).  In many ways, the requirement that a plaintiff show a lack of probable cause goes from being fish-in-a-barrel easy for the plaintiff to satisfy at the motion-to-dismiss stage -- all the plaintiff has to do to avoid dismissal is avoid pleading facts that would give rise to a probable-cause determination -- to being rather exacting at the summary-judgment stage -- probable cause is a low standard, and whether a given set of facts satisfies it is a question of law for the judge.  See Rouse v. Burnham, 51 F.2d 709, 712 (10th Cir. 1931)("The question of probable cause is a mixed question of law and fact.  Whether the circumstances alleged . . . existed, is a matter of fact; but whether, supposing them to be true, they amount to probable cause, is a question of law.").  Here, the City of Albuquerque does not contest Griego's allegations that he was arrested without probable cause, either in the context of his failure-to-train claim or his false-arrest claim, which the MTD leaves untouched.  Griego has, thus, properly pled that Stockton violated his constitutional rights, specifically those that the Fourth Amendment protects.

As to the second prong, that the City of Albuquerque has a policy, practice, or custom in place, Griego pleads the following allegations:

> Upon information and belief, a system maintained by ALBUQUERQUE and/or APD has failed to properly investigate and review unjustified behavior and activities by police officers, and has failed to identify violative acts by police officers and to subject police officers to discipline, closer supervision, necessary training, and as a result it has become the policy, practice, pattern, procedure and/or custom of ALBUQUERQUE and/or APD to tolerate, condone and

disregard the improper and unlawful acts, false arrests and detentions and other wrongful actions by police officers, including STOCKTON.

. . . .

Upon information and belief, it was the policy, practice, pattern, procedure and/or custom of ALBQUERQUE and/or APD to make an arrest whenever the police respond to calls of domestic disturbances and/or abuse, regardless of the source of information.

Upon information and belief, it was also the policy, practice, pattern, procedure and/or custom of ALBQUERQUE and/or APD to arrest a male participant instead of a female participant at the scene of a domestic disturbance.

Upon information and belief, these policies, practices, patterns, procedures and/or customs of ALBQUERQUE and/or APD resulted in improper and inadequate training of APD police officers, including STOCKTON.

Complaint ¶ 109, at 24; id. ¶¶ 124-126, at 28.[10]  These allegations are conclusory, and the Court need not accept them as true.  They are supported by neither a pattern of similar instances nor

---

[10]These allegations were made in the section of the Complaint devoted to the failure-to-investigate and equal-protection claims and not in the section devoted to the failure-to-train claim.  The City of Albuquerque argues that this placement is analytically important, and that Griego should not be able to retroactively cross-pollinate claim five's legal theory with claim eight's factual allegations.  See Response at 3-4.  The Court, however, can find no support for this conception of pleading.  All Griego must do is set forth a jurisdictional statement, "a short and plain statement of the claim showing that the pleader is entitled to relief," and a specification of the relief sought.  Fed. R. Civ. P. 8(a).  If there were more elaborate rules on the partitioning of pleadings into individual causes of action -- including that the walls between claims would be impermeable to factual allegations from other claims -- one would expect to see them in rule 10, which contains some fairly specific, formal rules for organizing pleadings.  See, e.g., Fed. R. Civ. P. 10(a) ("Every pleading must have a caption with the court's name, a title, a file number, and a Rule 7(a) designation. The title of the complaint must name all the parties; the title of other pleadings, after naming the first party on each side, may refer generally to other parties.").  The closest rule 10 comes, however, is the following:

A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances.  A later pleading may refer by number to a paragraph in an earlier pleading.  If doing so would promote clarity, each claim founded on a separate transaction or occurrence -- and each defense other than a denial -- must be stated in a separate count or defense.

other evidence, such as statements from police officers or other APD insiders, or written training materials or oral commands.  Such support is necessary; Griego must plead facts that, if true, give rise to a plausible inference that the policy he alleges exists.  See Law Regarding Liability for Constitutional Violations Under 42 U.S.C. § 1983, Part 4, Municipal Liability, supra, at 25-31.  For this reason, the Court will dismiss Griego's claim, but it will complete its analysis to determine whether the dismissal should be with or without prejudice.

Turning to the third prong, Griego alleges the direct causal link between the APD's policy and his own constitutional injury as follows:

> Employees of ALBUQUERQUE and/or APD, and individual police officers, including STOCKTON, were aware at all times alleged in this Complaint that the unconstitutional conduct and actions they took would not be fully, aggressively, honestly or properly investigated, if at all, and that they would not be reprimanded or punished for their conduct.  In addition they knew or were aware and believed that they would be indemnified from civil liability regardless of the illegality or unconstitutionality of their actions.   This further prompted Albuquerque police officers, including STOCKTON, to conduct themselves in an unlawful and improper manner.

> ALBUQUERQUE and/or APD's failure to properly investigate the actions taken by its Police Officers, including STOCKTON, in this incident and in other similar incidents, directly caused GRIEGO to suffer injuries and damages.

> . . . .

> Upon information and belief, these policies, practices, patterns, procedures and/or customs of ALBUQUERQUE and/or APD resulted in improper and inadequate training of APD police officers, including STOCKTON.

---

Fed. R. Civ. P. 10(b).  All the claims in Griego's Complaint relate to a single "transaction or occurrence."  Fed. R. Civ. P. 10(b).  While the term "set of circumstances" is more amorphous, if the claim-six and claim-eight factual allegations are vitally relevant to claim five's legal theory -- and they are -- then it would seem to the Court that they constitute an overlapping set of circumstances.  Although it may be good practice for plaintiffs to draft their complaints with a keen eye towards organization and claim structure -- in a long complaint, the Court might miss an allegation in the claim-x section when analyzing claim y under rule 12(b)(6) -- the Court sees no reason why it should not consider the allegations in ¶¶ 124 and 125, despite their placement further back in the Complaint.

Upon information and belief, these policies, practices, patterns, procedures and/or customs of ALBQUERQUE and/or APD resulted in APD police officers, including STOCKTON, conducting inadequate investigations resulting in arrests unsupported by probable cause.

Upon information and belief, these policies, practices, patterns, procedures and/or customs of ALBQUERQUE and/or APD results in APD police officers, including STOCKTON, arresting males, including GRIEGO, without probable cause.

Complaint ¶¶ 110-111, at 24-25; id. ¶¶ 126-128, at 28.   See Complaint ¶ 21, at 6 ("STOCKTON's reply was 'I am required to make an arrest.'"); id. ¶ 130, at 29 ("Defendants' violative actions occurred because GRIEGO is a male."). The Court does not have much to add to the Complaint's built-in analysis. Griego's theory is that the APD maintains an over-zealous -- although some would say over-cautious -- policy of arresting males at domestic-violence calls. As a direct result of this policy, Griego -- a male involved in a domestic-violence call -- was arrested, despite there being no probable cause to support his arrest. But for the policy, Stockton would presumably not have arrested Griego without probable cause, but, because of the policy, he did.

Griego has not plausibly pleaded a policy, but because he has properly plead the other two prongs of his claim, and because Griego may be able to amend his Complaint to rectify the deficiencies in pleading the policy, the Court will dismiss this claim without prejudice. Griego may seek leave to amend his Complaint, and reallege a claim for failure to train or supervise under § 1983 and Monell.

## III. THE COURT WILL DISMISS GRIEGO'S EIGHTH CLAIM -- HIS EQUAL-PROTECTION CLAIM -- WITHOUT PREJUDICE, BECAUSE GRIEGO HAS FAILED TO ALLEGE FACTS THAT GIVE RISE TO A PLAUSIBLE INFERENCE THAT THE APD HAS A POLICY, PRACTICE, OR CUSTOM IN PLACE.

Griego's equal-protection claim fails for the same reason that his claim for failure to supervise or train does. Essentially the same policy, practice, or custom -- that the APD

excessively arrests men, but not women, at domestic-violence calls -- sits at the heart of both claims,[11] and Griego has not supported it with facts that give rise to a plausible inference of its existence.   The Court will, however, analyze Griego's equal-protection claim to determine whether, had the policy been properly pled, it would state a claim for relief, or if allowing Griego the opportunity to amend would be futile.   The Court concludes that, if Griego can plausibly allege the existence of the policy he says exists, then he can make out a viable equal-protection claim.

If the APD's alleged arrest-all-males policy of handling domestic-violence calls were a formal written policy, then it would be subject to intermediate scrutiny -- meaning that the policy must be "substantially related" to an "important" governmental interest -- because gender is a quasi-suspect classification for equal-protection purposes.   City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 441 (1985)("A gender classification fails unless it is substantially related to a sufficiently important governmental interest.").   Griego has alleged no formal or written policy -- whether an informal policy exists at all is ultimately a question of fact -- and so

---

[11]Different aspects of this policy are relevant to the two claims.   For the failure-to-train-or-supervise claim, the relevant aspect of the policy is that the APD makes excessive arrests -- i.e., that they are encouraged to make an arrest, even without probable cause, in alleged domestic-violence situations -- and not that they tend to arrest the man rather than the woman. For the equal-protection claim, the relevant aspect of the policy is that they systemically arrest men in circumstances when they would not arrest women.   Even if there is probable cause for every domestic-violence arrest that the APD makes, if the APD arrests men in circumstances where it would not arrest a similarly situated woman, then that aspect of the policy violates the Equal Protection Clause -- although, as the Court will note, a man and a woman are not necessarily "similarly situated" if the man is larger or behaving more aggressively than the woman, and, thus, disparate results in such circumstances may be justified, provided that the disparate results are based on individualized assessments of each situation, rather than broad stereotypes about men and women.

Whether Griego alleges a two policies or a single policy with two aspects does not affect the Court's analysis; he has not alleged either one plausibly.   Griego should bear in mind -- if he plans to amend his Complaint -- that the APD's policy must contain both aspects if it is to support both claims.

the analysis changes.  Discriminatory application of a facially neutral law -- and New Mexico's domestic-battery statute is facially neutral[12] -- violates the Equal Protection Clause when there is a showing of both (i) discriminatory intent or purpose; and (ii) discriminatory effect.  See United States v. Armstrong, 517 U.S. 456, 465 (1996); Washington v. Davis, 426 U.S. 229, 239 (1976) ("[O]ur cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact."  (emphasis in original)); Palmer v. Thompson, 403 U.S. 217, 224 (1971)("[N]o case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it.").  See also Marsh v. Newton, 134 F.3d 383, at *2 (10th Cir.)(unpublished)("'To establish a gender-based claim under the Equal Protection Clause, [the plaintiff] must, as a threshold matter, demonstrate that [the plaintiff has] been treated differently by a state actor than others who are similarly situated simply because [the plaintiff] belong[s] to a particular class.'"  (quoting Keevan v. Smith, 100 F.3d 644, 647-48 (8th Cir. 1996)); Barney v. Pulsipher, 143 F.3d 1299, 1312 (10th Cir. 1998)(holding that, "to assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were differently treated from others who were similarly situated to them").  If the plaintiff can produce evidence of discriminatory purpose, then the burden shifts to the government to prove that it would have taken the same action without the discriminatory motivation.  See Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 265 (1977); Villanueva v. Carere, 85 F.3d 481, 485 (10th Cir. 1996)("The discriminatory purpose need not be the only purpose, but it must be a 'motivating factor in the decision.'"  (citation omitted)).

---

[12]The law under which Griego was charged -- and the one he alleges is applied discriminatorily to men -- provides: "Battery against a household member consists of the unlawful, intentional touching or application of force to the person of a household member, when done in a rude, insolent or angry manner."  N.M. Stat. Ann. § 30-3-15A.

Discriminatory purpose is, substantively, a high bar:

> "Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences.  See United Jewish Organizations v. Carey, 430 U.S. 144, 179 (concurring opinion).  It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.
>
> . . . .
>
> This is not to say that the inevitability or foreseeability of consequences of a neutral rule has no bearing upon the existence of discriminatory intent.  Certainly, when the adverse consequences of a law upon an identifiable group are as inevitable as the gender-based consequences of ch. 31, § 23, a strong inference that the adverse effects were desired can reasonably be drawn.  But in this inquiry -- made as it is under the Constitution -- an inference is a working tool, not a synonym for proof.  When, as here, the impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate, and when, as here, the statutory history and all of the available evidence affirmatively demonstrate the opposite, the inference simply fails to ripen into proof.

Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 & n.25 (1979).  As the last paragraph suggests, discriminatory intent is like mens rea in a criminal case, in that a seemingly impossible-to-ascertain substantive standard is softened by evidentiary practicalities: "What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid.  Often it is made clear from what has been called, in a different context, 'the give and take of the situation.'"  Personnel Adm'r of Mass. v. Feeney, 442 U.S. at 279 n.24 (citation omitted).  The Supreme Court has okayed three ways for district courts to ascertain discriminatory intent.  The first is where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."  Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. at 266.  The Supreme Court has warned, however, that "such cases are rare," and that, "[a]bsent a pattern as stark as that in Gomillion [v. Lightfoot, 364 U.S. 339 (1960),] or Yick Wo [v.

Hopkins, 118 U.S. 356 (1886)], impact alone is not determinative."[13]   Village of Arlington

Heights v. Metropolitan Housing Dev. Corp., 429 U.S. at 266.   Second, the district court can

look at the historical backdrop of the alleged discriminatory actions: "The historical background

of the decision is one evidentiary source, particularly if it reveals a series of official actions taken

for invidious purposes.   The specific sequence of events leading up the challenged decision also

may shed some light on the decisionmaker's purposes."   Village of Arlington Heights v.

Metropolitan Housing Dev. Corp., 429 U.S. at 267.   The Supreme Court cited Lane v. Wilson,

307 U.S. 268 (1939), Griffin v. School Board of Prince Edward County, 377 U.S. 218 (1964),

and Guinn v. United States, 238 U.S. 347 (1915), as prime examples of this methodology.[14]

Third, the district court can look to the law's legislative history or to the administrative history of

its interpretation and application.   See Village of Arlington Heights v. Metropolitan Housing

Dev. Corp., 429 U.S. at 267.   District courts may consider "contemporary statements by

members of the decisionmaking body, minutes of its meetings, . . . reports," and, "[i]n some

---

[13]In Yick Wo v. Hopkins, a city ordinance required that laundries be located in brick or stone buildings unless a waiver was obtained.  See 118 U.S. at 368.  Over 200 petitions for waivers from Chinese applicants were denied, while only one petition for waiver from a non-Chinese applicant was denied.  See 118 U.S. at 374.

In Gomillion v. Lightfoot, the city of Tuskeegee, Alabama redrew its boundaries from a square into a 28-sided figure to exclude blacks from participating in city elections and using city services.  See 364 U.S. at 340.  All but four or five of the 400 blacks formerly in the city were excluded from the newly bounded city.  See 364 U.S. at 341.

[14]Guinn v. United States involved an Oklahoma law that mandated literacy tests for all prospective voters, but exempted those whose grandfathers had been able to vote -- effectively granting a blanket exemption to whites.  See 238 U.S. at 356-57.  After the Supreme Court struck down that law, Oklahoma adopted a new law -- the subject of Lane v. Wilson -- providing that individuals who were registered in 1914 need not reregister, while those who had not registered to vote in 1914 could register only in a twelve-day registration period six months before the election.  See 307 U.S. at 271.

In Griffin v. School Board of Prince Edward County, a county which had recently been the subject of a desegregation order decided to close all of its public schools and, instead, use education funds to pay vouchers to families to send their children to private schools -- which were, for the most part, segregated.  See 377 U.S. at 221-23.

extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege." Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. at 267.

Griego's equal-protection claim is plausible, or at least it might be, if he amends his Complaint to plausibly plead the policy. The policy -- if it exists -- certainly has a discriminatory effect. The City of Albuquerque argues that Griego does not properly allege the APD's discriminatory intent, but the Court disagrees. Although the words "intent," "purpose," and "discriminatory" are nowhere to be found in the Complaint, the Complaint nonetheless plausibly alleges a discriminatory purpose. Compare Personnel Adm'r of Mass. v. Feeney, 442 U.S. at 279 (defining the legal standard for "discriminatory purpose" as being that the defendant "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group" (emphasis added)), with Complaint ¶ 130, at 29 ("Defendants' violative actions occurred because GRIEGO is a male." (emphasis added)). In the same way that rule 9(b) heightens pleading-specificity standards in the fraud context, it relaxes them in the state-of-mind context. See Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). The federal judicial system's notice-pleading regime is little served by plaintiffs alleging the defendant's state of mind: the defendant knows it to a certainty, while the plaintiff is merely guessing. Pleading state of mind in so many words -- i.e., literally writing the words "discriminatory purpose" or "anti-male intent" -- is checking a box,[15] and dismissing a claim without prejudice so

---

[15]The Court adopts the Seventh Circuit's reasoning and concludes that Griego does not have to include the words "discriminatory intent" or "discriminatory purpose" in his Complaint. See Borsellino v. Goldman Sachs Grp., Inc., 477 F.3d 502, 508 (7th Cir. 2007)("Rule 9(b) does not require pleading state of mind, but [the] complaint must afford some basis for believing that plaintiffs can prove scienter." (characterizing Tricontinental Indus., Ltd. v.

that the plaintiff can amend the complaint to add two or three "magic words" contributes little to the case's resolution.  If the plaintiff pleads facts that, if true, would give rise to a reasonable inference that the elements of the cause of action are established, then that is good enough for the motion-to-dismiss stage.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff."  (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))). "Rule 9(b) does not require pleading state of mind, but [the] complaint must afford some basis for believing that plaintiffs can prove scienter."  Borsellino v. Goldman Sachs Grp., Inc., 477 F.3d 502, 508 (7th Cir. 2007)(characterizing Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP, 475 F.3d 824 (7th Cir. 2007)).

If Griego can plausibly plead the policy, then the policy gives rise to as plausible an inference of anti-male sentiment by a police force as any.  An APD-wide policy of arresting males at domestic-violence calls could plausibly be viewed as reflecting assumptions that: (i) men are always, or usually, at fault for man-woman squabbles; (ii) men have an obligation,

---

PricewaterhouseCoopers, LLP, 475 F.3d 824 (7th Cir. 2007)).  Griego can thus plausibly allege that element without directly reciting it, in the same way that a plaintiff in a two-car-collision case can plausibly allege a negligence tort without explicitly stating that the defendant "owed a duty of due care to other drivers" or that "the defendant caused the plaintiffs' injuries."  If the two-car-collision plaintiff alleges that the defendant's car collided with hers, that she was injured, and that the collision caused her injuries, then she need not take the extra step and plead the literal causation element -- which is that the defendant, and not the collision, caused her injuries; the Court can take that analytical step on its own.

Still, as the Court is dismissing this claim without prejudice, Griego may wish to add these words if he elects to amend his Complaint.  As a matter of good practice, there is no reason not to check this box.

which women do not share, to proactively avoid man-woman altercations; (iii) men are intrinsically more dangerous, violent, unpredictable, or prone to outburst than women; (iv) man-on-woman violence is more morally reprehensible or worthy of police intervention than an equally medically serious quantum of woman-on-man violence; or (v) men deserve to be punished merely for letting a verbal altercation with a woman devolve into incivility, regardless whether the man committed the elements of assault or battery.  Griego should be aware, however, that the substantive content of the discriminatory-purpose requirement is rigorous.  Going forward, he must prove that the APD "selected or reaffirmed" its policy "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon" men.  Personnel Adm'r of Mass. v. Feeney, 442 U.S. at 279.  This showing will present serious challenges at the summary-judgment stage, let alone at trial.  Griego will likely be able to marshal statistics showing that a disproportionate number of domestic-violence calls end in the arrest of the male at the scene.  He may also be able to dig up some improvidently worded statements by officers, one-sided written training materials, and compelling anecdotes.  He, not the City of Albuquerque, bears the burden of proof, however, and he will likely have to contend with several adverse inferences.  For one thing, the bulk of the APD officer corps are likely to be male themselves, thus raising the question why they would discriminate against individuals who share their own gender status. For another, in a man-woman relationship, the woman is usually the shorter, lighter, physically less-powerful member of the duo, thus making concerns over possible physical injuries (from single incidents) and psychological damage (from repeated abuse) a largely woman-oriented worry in practice.

It could be that the APD's actual policy is to assess each domestic-violence situation individually and favor the more physically vulnerable party, with the idea being that, while a

weaker person's physical aggression towards a stronger person may be illegal, the odds of serious harm resulting -- and thus the justification for devoting limited police resources to the situation -- are greater when it is the other way around.   A size-and-strength-based policy undoubtedly has a disparate impact on men, but disparate impact does not make out an equal-protection claim, and such a policy might reduce the aggregate amount of domestic-violence injury sustained by the population, whereas a more consciously gender-neutral policy -- one that deliberately blinds itself to disparities in size, strength, and other gender-correlated traits -- might result in more domestic-violence injury overall.   If the APD's goal is assumed to be the non-discriminatory minimization of domestic-violence injury among all citizens -- which may or may not be the APD's goal, but it is certainly a constitutionally permissible goal -- then one would expect to see more men arrested than women to the same extent that (i) there are more man-on-woman batteries than woman-on-man batteries;[16] and (ii) the average man-on-woman battery

---

[16]The Court does not mean to suggest that this possibility -- that men commit more cross-gender domestic violence than women -- is empirically true, but only that, if it is true, then it would be a contributing factor in explaining how a gender-neutral policy could produce more arrests of men than women.  Empirical research on this question is divided, compare Daniel J. Whitaker et al., Differences in Frequency of Violence and Reported Injury Between Relationships with Reciprocal and Nonreciprocal Intimate Partner Violence, 97 Am. J. Pub. Health 941 (2006)(reporting that over seventy percent of domestic violence is committed by women), and Cathy Young, The Surprising Truth About Women and Violence, Time (June 25, 2014), available at  http://time.com/2921491/hope-solo-women-violence, with American Bar Association Commission on Domestic & Sexual Violence, Domestic Violence Statistics, http://www.americanbar.org/groups/domestic_violence/resources/statistics.html  (asserting that "[a]pproximately 1.3 million women and 835,000 men are physically assaulted by an intimate partner annually in the United States"), although it seems that man-on-woman domestic violence is overwhelmingly more reported than woman-on-man domestic violence, see, e.g., Domestic Violence Intervention Program, Myths & Facts About Domestic Violence, http://www.dvipiowa.org/myths-facts-about-domestic-violence (noting that "95% of domestic violence is reported by women . . . against . . . their male partner"), and -- in fairness to the APD -- it can only be expected to respond to domestic-violence situations to which it is called, so the reported statistic is perhaps more important to the equal-protection issue than the actual statistic.

causes more severe injuries than the average woman-on-man battery.[17]   Basically, there are numerous traits -- like size and strength -- that tend to fall along gender lines, but that are highly relevant to a police officer's proper handling of a physical altercation.  Griego must prove that the APD's alleged policy (i) exists; and (ii) is based on gender and not on one of these gender-correlated traits.

The burden of showing discriminatory intent is high, but not impossibly so.  Mere disparate impact will not suffice, but nor must Griego prove animus -- i.e., that the APD is a misandrist organization that promulgated and effectuated its policy out of hatred towards men. Griego must show that the APD's policy exists "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon" men.  Personnel Adm'r of Mass. v. Feeney, 442 U.S. at 279.  While there are many gender-associated physical traits that could provide a constitutionally permissible explanation for the disparate impact of domestic-violence enforcement, there are equally many ways that the APD could be cloaking a discriminatory policy in the garb of modern psychobabble.  The Court is somewhat concerned with the casual ease with which modern domestic-violence literature throws around unqualified gender distinctions, see, e.g., Karina Bland, Signs Almost Always Precede Deadly Domestic Violence Cases, USA Today, available at       http://usatoday30.usatoday.com/news/nation/story/2012-06-10/domestic-violence-signs/ 55496458/1 (referring to domestic-violence victims with the female pronoun and abusers with the male pronoun, and noting that "[c]oercive control is almost exclusively the domain of men"),

_____

[17]A woman-on-man battery is equally "criminal" to a man-on-woman battery, but that fact does not mean that the APD has an obligation to devote equal resources to the two if (i) man-on-woman battery causes more harm than woman-on-man assault; and (ii) the APD's increased attention to man-on-woman batteries versus woman-on-man batteries is purely incidental, i.e., if the APD only ends up pursuing man-on-woman batteries more vigorously when they cause more harm, because they cause more harm, and to the extent that they cause more harm.

and with the pressure being placed on police forces to uncritically accept these assumptions. Assertions that men are more likely than women to murder their partner with a weapon, while "women [are] generally peaceful and non-violent," Domestic Violence Intervention Program, Myths & Facts About Domestic Violence, http://www.dvipiowa.org/myths-facts-about-domestic-violence, may be statistically supported, but the APD may not use them as a justification for adopting an unabashedly anti-male policy -- one that favors women and punishes men, because women are women and men are men. Equal-protection jurisprudence does not accept statistical justifications for gender discrimination, any more than it would tolerate a police force having different deadly-force policies for suspects of different racial backgrounds on the basis of violent-crime demography. Eradicating domestic violence is an admirable goal, but the APD may not cut corners by incorporating popular stereotypes about the intrinsic psychological differences between men and women into its police work, even if those assumptions would allow the APD to reduce a greater amount of domestic violence using the same resources. The Equal Protection Clause does not bend to accommodate the APD's convenience or the City of Albuquerque's budgetary constraints; they must, instead, tailor their policies to meet the demands of the Equal Protection Clause.

Griego must seek leave to amend his Complaint to add facts that plausibly suggest that the APD's anti-male domestic-violence policy exists if he wants to maintain his equal-protection claim. Even after he amends his Complaint to properly allege his equal-protection claim, Griego faces a tough task going forward in proving the claim. For now, the Court dismisses the claim without prejudice.

**IT IS ORDERED** that: (i) the Motion to Dismiss, filed November 22, 2013 (Doc. 9), is granted in part and denied in part; (ii) all claims against Defendants Albuquerque Police

Department and Albuquerque Police Office Robert Stockton, Jr., in his official capacity are dismissed with prejudice; (iii) the fourth, sixth, ninth, tenth, and twelfth claims in the Verified Complaint, filed September 24, 2013 (Doc. 1), are dismissed with prejudice as to all Defendants; and (iv) the fifth, eighth, and eleventh claims are dismissed without prejudice as to all Defendants.

_____<br>
UNITED STATES DISTRICT JUDGE

*Counsel*:

Wayne Baker
Albuquerque, New Mexico

     *Attorney for the Plaintiff*

David Tourek
  City Attorney
Kristin J. Dalton
  Assistant City Attorney
Albuquerque City Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Defendants*