## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PAUL GRIEGO,

       Plaintiff,

vs.                                  No. CIV 13-0929 JB/KBM

CITY OF ALBUQUERQUE;
ALBUQUERQUE POLICE DEPARTMENT;
and ALBUQUERQUE POLICE OFFICER
ROBERT STOCKTON, JR., in his individual
and official capacities,

       Defendants.

## <u>MEMORANDUM OPINION</u>[1]

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment, filed January 21, 2015 (Doc. 35)("MSJ"). The Court held a hearing on April 8, 2015. The primary issues are: (i) whether Defendant Robert Stockton, Jr., had probable cause to arrest Plaintiff Paul Griego; and (ii) if he did not, whether Stockton violated clearly established law regarding probable cause by arresting Griego. First, because Stockton had information suggesting that Griego kicked a household member and endangered his child, and Griego corroborated that information, Stockton had probable cause to arrest Griego. Second, even if a constitutional violation occurred, the law was not clearly established so that a reasonable officer in Stockton's position would have understood he was violating Griego's constitutional rights.

---

[1]The Court earlier entered an Interlocutory Order, filed September 24, 2015 (Doc. 52), granting the Defendants' Motion for Summary Judgment, filed January 21, 2015 (Doc. 35). In the Interlocutory Order, the Court stated that it would "at a later date issue a memorandum opinion more fully detailing its rationale for this decision." Interlocutory Order at 1 n.1. This Memorandum Opinion is the promised opinion.

Accordingly, the Court grants the MSJ in its entirety.  It dismisses Griego's federal claims with prejudice and dismisses his state law claims without prejudice.

## FACTUAL BACKGROUND

Stockton works as a police officer in Albuquerque, New Mexico.  See Defendants' Motion for Summary Judgment at 1, filed January 21, 2015 (Doc. 35)("MSJ").   At approximately 12:40 p.m. on September 25, 2010, Plaintiff Paul Griego went to the residence of his daughter's mother, Amie Petersen, to pick up his three-year-old daughter.  See MSJ ¶ 1, at 3 (setting forth this fact).[2]  While at Petersen's home, Griego and Petersen were involved in a physical altercation struggling over their daughter.  See MSJ ¶ 2, at 3 (setting forth this fact).[3] Griego then left Petersen's home, and called the police between 1:00 p.m. and 2:00 p.m.  See MSJ ¶¶ 3-4, at 3 (setting forth this fact); Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment ¶ 1, at 2, filed February 18, 2015 (Doc. 43)("Response")(not disputing this fact).  In response to Griego's call, Officer George Garcia arrived at Petersen's

---

[2]Griego does not address this fact.  The local rules state:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).   Because Griego does not address this fact, the Court deems it undisputed.  See D.N.M.LR-Civ. 56(b).

[3]Because Griego does not address this fact, the Court deems it undisputed.   See D.N.M.LR-Civ. 56(b).

home shortly after 2:00 p.m.  He called paramedics, who arrived around 2:30 p.m., to ensure

Griego and Petersen's daughter was unharmed.  See MSJ ¶ 5, at 3.[4]

Griego admitted to Garcia that he used his right foot to fend Petersen off and kicked her

lower left leg.  See MSJ ¶ 6, at 4 (setting forth this fact); State of New Mexico Uniform Incident

Report for Case No. 100093523 at 2, filed January 21, 2015 (Doc. 35-1)("Police Report")("Paul

stated he used his right foot to fiend [sic] off Amy [sic], and kicked her lower left leg.").[5]  Garcia

left Griego's residence around 3:05 p.m.  See MSJ ¶ 7, at 4 (setting forth this fact).[6]  Stockton

responded to Petersen's 911 call concerning her dispute with Griego.  See MSJ ¶ 8, at 4 (setting

forth this fact).[7]  When he arrived at her home around 3:35 p.m., Petersen was "crying heavily,

shaking, and appeared upset."  MSJ ¶ 9, at 4 (setting forth this fact).[8]  Petersen told Stockton

---

[4]Because Griego does not address this fact, the Court deems it undisputed.  See
D.N.M.LR-Civ. 56(b).

[5]Griego states that he disputes this fact, but provides no evidence in the record to suggest
the fact is untrue or to contradict Stockton's evidence supporting the fact.  See Response ¶ 2, at
2.  The evidence in the record that Stockton cites supports this material fact.  See Police Report
at 2 ("Paul stated he used his right foot to fiend [sic] off Amy [sic], and kicked her lower left
leg.").  The Court therefore deems this factual assertion undisputed.  See D.N.M.LR-Civ.
56.1(b).

[6]Because Griego does not address this fact, the Court deems it undisputed.  See
D.N.M.LR-Civ. 56(b).

[7]Because Griego does not address this fact, the Court deems it undisputed.  See
D.N.M.LR-Civ. 56(b).

[8]Griego does not specifically dispute this fact.  He instead argues that Petersen's account
of the events should speak for itself because Stockton used a digital recorder.  See Response ¶ 3,
at 2.  He then contends that the recording did not record the entire conversation, so "a negative
inference should be applied permitting the conclusion that evidence unfavorable to STOCKTON
was contained in the unrecorded conversation."  Response ¶ 3, at 2.  The evidence in the record
supports Stockton's factual assertion.  See Transcript of Officer Stockton's Belt Tape at 1:1-11,
filed January 21, 2015 (Doc. 35-5)(reflecting that Petersen was crying and upset).  Because
Griego does not specifically dispute this factual assertion and does not "refer with particularity to

that, when Griego arrived at her home, he "tried to hand her legal papers, complaining about having to pay legal fees." MSJ ¶ 10, at 4 (setting forth this fact).[9] Petersen told Griego that "it wasn't her problem and he got upset and stood up in an angry manner and said 'This, or I'm gonna put an end to your bullshit.'" MSJ ¶ 10, at 4 (setting forth this fact).[10] Petersen told Stockton that she felt intimidated and fearful of Griego, so she grabbed her daughter's hands, and Griego kicked her in the lower left shin with his right leg, causing her to fall down. See MSJ ¶¶ 10-11, at 4 (setting forth this fact).[11]

In accordance with Petersen's statements, Stockton observed a horizontal line and redness under Petersen's knee. See MSJ ¶ 12, at 5 (setting forth this fact).[12] He called a field investigator to take photographs, then he went to his vehicle. See MSJ ¶ 13, at 5 (setting forth

---

those portions of the record" that dispute Stockton's factual assertion, the Court deems it undisputed. D.N.M.LR-Civ. 56(b).

[9]Griego does not specifically dispute this fact. He instead argues that Petersen's account of the events should speak for itself, because Stockton used a digital recorder. See Response ¶ 3, at 2. Because Griego does not specifically dispute this factual assertion and does not "refer with particularity to those portions of the record" that dispute Stockton's factual assertion, the Court deems it undisputed. D.N.M.LR-Civ. 56(b).

[10]Griego does not specifically dispute this fact. He instead argues that Petersen's account of the events should speak for itself, because Stockton used a digital recorder. See Response ¶ 3, at 2. Because Griego does not specifically dispute this factual assertion and does not "refer with particularity to those portions of the record" that dispute Stockton's factual assertion, the Court deems it undisputed. D.N.M.LR-Civ. 56(b).

[11]Griego does not specifically dispute this fact. He instead argues that Petersen's account of the events should speak for itself, because Stockton used a digital recorder. See Response ¶ 3, at 2. Because Griego does not specifically dispute this factual assertion and does not "refer with particularity to those portions of the record" that dispute Stockton's factual assertion, the Court deems it undisputed. D.N.M.LR-Civ. 56(b).

[12]Because Griego does not address this fact, the Court deems it undisputed. See D.N.M.LR-Civ. 56(b).

this fact).[13]  He then discovered that Griego had requested police service, so he went to Griego's

home.  See MSJ ¶ 13, at 5 (setting forth this fact).[14]  When he arrived, Griego allowed him inside

and willingly discussed the incident.  See MSJ ¶ 14, at 5 (setting forth this fact).[15]  Griego told

Stockton that he got into a physical dispute with Petersen, which began when she tried to take

their daughter out of his arms.  See MSJ ¶ 15, at 5 (setting forth this fact).[16]  Griego told

Stockton that, during the dispute, as Petersen used her arm to push Griego's face and neck away,

he "raised his right leg up and used his foot to push her knee and push her back" to free himself.

---

[13]Because Griego does not address this fact, the Court deems it undisputed.  See D.N.M.LR-Civ. 56(b).

[14]Griego does not specifically dispute this fact.  He instead argues that he called for service before Stockton interviewed Petersen.  See Response ¶ 6, at 3.  Griego's argument does not dispute the fact that Stockton was notified of Griego's call for service after interviewing Petersen.  The Court therefore deems Stockton's factual assertion undisputed.  See D.N.M.LR-Civ. 56(b).

[15]Griego does not dispute that he allowed Stockton into his home, nor does he dispute that he willingly spoke about the incident.  He perhaps suggests that, because Stockton did not fully inform him of everything that had transpired before Stockton's visit, Griego's discussion could not have been willing.  See Response ¶ 7, at 3-4.  The evidence in the record, however, supports Stockton's factual assertion.  See Transcript of Officer Stockton's Belt Tape at 10:3-8. Griego introduces no evidence to suggest that his discussion with Stockton was not willing, so the Court deems Stockton's factual assertion undisputed.  See D.N.M.LR-Civ. 56(b).

[16]Because Griego does not address this fact, the Court deems it undisputed.  See D.N.M.LR-Civ. 56(b).

MSJ ¶ 16, at 5-6 (setting forth this fact).[17]   Griego further told Stockton that the struggle injured

the child.   See Response ¶ 8, at 4 (setting forth this fact).[18]

After hearing Griego corroborate Petersen's statement that he pushed her with his right

foot, Stockton took Griego into custody for domestic violence and battery on a household

member, handcuffing him after walking him to a police car.   See MSJ ¶ 17, at 6.[19]   The State

brought charges against Griego and held a trial.   The state district court stated that "there is

enough evidence for a jury to convict at this point."   MSJ ¶ 18, at 6 (quoting State of New

Mexico v. Paul Cash [sic]; DV-4976-10 Transcript of Proceedings at 134:14-15 (taken February

10-11, 2011)(Doc. 35-4)("Transcript of State Trial")).[20]   During Griego's state trial, he testified

---

[17]Griego does not dispute that he told Stockton that he used his foot to push Petersen, so the Court deems this fact undisputed.   He argues that this statement should be considered in context.   See Response ¶ 8, at 4.   Because Griego does not specifically dispute Stockton's material fact and provides no evidence to contradict it, the Court deems it undisputed.   See D.N.M.LR-Civ. 56(b).

[18]The local rules provide that the "[r]esponse may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.   Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies."   D.N.M.LR-Civ. 56.1(b). Griego made several statements in the Response that the Court understands to be attempts to set forth additional facts, but Griego did not refer with particularity to portions of the record on which he relies.   The Court has reviewed the portions of the record to which Griego vaguely refers and determines that the record supports Griego's factual assertion.   See Transcript of Officer Stockton's Belt Tape at 13:1 (stating that "she was hurt"); id. at 13:11-15 (describing the dispute as hurting the child); id. at 13:19-20 (stating that he pushed Petersen with his foot because the dispute was hurting the child); Tr. at 17:7-15 (Baker)(admitting that Griego told Stockton that the dispute hurt the child).   Although Griego did not abide by the local rules in how he asserted his additional facts, the Court will accept as undisputed the asserted facts that the record supports.

[19]Because Griego does not address this fact, the Court deems it undisputed.   See D.N.M.LR-Civ. 56(b).

[20]Griego does not dispute this factual assertion, but argues that it is irrelevant.   See Response ¶ 9, at 4.   Contending that a fact is irrelevant or not material does not dispute the fact, nor does it controvert the fact by directing the Court with particularity to the record.   See

under oath that he hit Petersen's leg with his right foot and that she fell backwards.  See MSJ ¶¶ 19-20, at 6 (quoting Transcript of State Trial at 152:6-9 (Griego); id. at 152:15-153:6 (Griego, Siegel); id. at 176:9-177:3; id. at 177:17-20).[21]  His testimony suggests that he kicked Petersen because he lost his balance.  See Transcript of State Trial at 152:15-153:6 (Griego, Siegel); id. at 176:9-177:3).

## PROCEDURAL BACKGROUND

Griego commenced this action in federal court on September 24, 2013.  He asserts twelve claims: (i) a claim for false arrest in violation of the Fourth Amendment to the Constitution of the United States of America under 42 U.S.C. § 1983, see Complaint ¶¶ 44-52, at 12-13; (ii) a § 1983 claim for false imprisonment under the Fourth Amendment, see Complaint ¶¶ 53-64, at 14-16; (iii) a § 1983 claim for malicious prosecution, see Complaint ¶¶ 65-75, at 16-18; (iv) state-law claims for false arrest, false imprisonment, and malicious prosecution, see Complaint ¶¶ 76-92, at 18-20; (v) a claim under § 1983 and Monell v. Department of Social Services, 436 U.S. 658, 689 (1978)("Monell"), for failure to supervise and failure to train, see Complaint ¶¶ 93-105, at 21-23; (vi) a claim under § 1983 and Monell for failure to properly investigate, see Complaint ¶¶ 106-114, at 23-25; (vii) a claim under § 1983 and Monell for "relief for arrests conducted without probable cause or arrest warrants," Complaint ¶¶ 115-121, at 26-27 (capitalization altered for readability); (viii) a claim for violation of the Equal Protection

---

D.N.M.LR-Civ. 56.1(b).    In O'Brien v. Mitchell, 883 F. Supp. 2d 1055 (D.N.M. 2012)(Browning, J.), the Court explained that, because the proper course is to determine relevance of facts in the analysis section, rather than in the factual section, objecting to an asserted fact as immaterial effectively deems the fact undisputed.  See 883 F. Supp. 2d at 1058 n.1.  The Court thus deems this fact undisputed and will, if necessary, determine its materiality in the analysis section.

[21]Griego does not dispute that his foot hit Petersen, but he argues that his trial testimony states that did so because he lost his balance.  See Response ¶ 10, at 4.  Because Griego does not dispute this fact, the Court deems it undisputed.  See D.N.M.LR-Civ. 56(b).

Clause of the Constitution of the United States, <u>see</u> Complaint ¶¶ 122-132, at 27-29; (ix) a claim for violation of substantive due process, <u>see</u> Complaint ¶¶ 133-143, at 29-31; (x) a claim for violation of procedural due process, <u>see</u> Complaint ¶¶ 144-154, at 31-33; (xi) a claim for violation of "Title VI of the Civil Rights Act of 1964 and the 'OJP Program Statute,'" Complaint ¶¶ 155-166, at 34-36; and (xii) a state-law claim for intentional infliction of emotional distress, <u>see</u> Complaint ¶¶ 167-172, at 36-37.

The Defendants filed a Motion to Dismiss on November 22, 2013 (Doc. 9)("MTD"). They sought to dismiss counts four, five, six, eight, nine, ten, eleven, and twelve, along with all claims against the Albuquerque Police Department and Stockton in his official capacity.  <u>See</u> MTD at 1.  The Court granted the MTD in part and denied it in part.  <u>See</u> Memorandum Opinion, filed April 11, 2015 (Doc. 51)("MO").   It dismissed (i) all claims against Defendants Albuquerque Police Department and Stockton, in his official capacity, with prejudice; (ii) the fourth, sixth, ninth, tenth, and twelfth claims in the Complaint with prejudice as to all Defendants; and (iii) the fifth, eighth, and eleventh claims without prejudice as to all Defendants. <u>See</u> MO at 62-63.  Thus, the only claims that remain are counts one, two, three, and seven.

Stockton filed the MSJ on January 21, 2015.  <u>See</u> MSJ at 1.  Stockton first argues that the Court should dismiss the remaining claims because he is entitled to qualified immunity.  <u>See</u> MSJ at 10.  Stockton argues that he had probable cause to arrest Griego and that, when a "warrantless arrest is the subject of a § 1983 action, the defendant is entitled to qualified immunity if probable cause existed."  MSJ at 11 (quoting <u>Wilder v. Turner</u>, 490 F.3d 810, 813 (10th Cir. 2007)).  He further argues that, if the Court finds that Stockton had probable cause on the unlawful arrest claim, it can "summarily dispose of Plaintiff's claim of false imprisonment as well," because both claims are premised on a lack of probable cause and contain nearly identical

elements.  MSJ at 14.  Next, Stockton argues that, because he had probable cause to arrest Griego, Griego cannot satisfy all the elements of a malicious prosecution claim.  See MSJ at 14.

Griego responded to the MSJ within a month.  See Response at 1.  The Response primarily argues that the Court should not grant the MSJ, because "there are numerous factual issues and discrepancies that call into question STOCKTON's decision to arrest GRIEGO." Response at 5.  First, Griego argues that Stockton is not entitled to qualified immunity, because the need for probable cause is clearly established.  See Response at 19.  Griego argues that Stockton did not have probable cause, because: (i) the crime was not committed in Stockton's presence; and (ii) he should have further investigated the situation before arresting Griego.  See Response at 5-10, 17.  Second, he asserts that, because Stockton arrested him without a warrant, "his false imprisonment claim raises the same genuine issues of material fact raised in the preceding false arrest argument."  Response at 21.  Regarding the malicious prosecution claim, Griego contends that Stockton acted with malice in adding a felony charge for child abuse, which is a question for the jury to decide.  See Response at 22.

Stockton replied to Griego's Response on March 4, 2015.  See Defendant's Reply to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment at 1, filed March 4, 2015 (Doc. 45)("Reply").  Stockton first contends that Griego does not deny the majority of the material facts in the MSJ and instead cites irrelevant facts that have no bearing on the outcome of the case.  See Reply at 1-2.  Stockton argues that, on the basis of the undisputed facts, he had probable cause to arrest Griego.  See Response at 3.  Stockton alleges that Griego's recitation of irrelevant facts does not diminish the probable cause that the undisputed facts demonstrate.  See Response at 3.

The Court held a hearing on the MSJ on April 8, 2014.  See Tr. of Hearing (taken April 8, 2015)("Tr.").[22]  Griego admitted that, during his conversation with Stockton, he told Stockton that the domestic dispute between Petersen and himself hurt the child.  See Tr. at 17:7-15 (Baker)(admitting that Griego told Stockton that the dispute hurt the child).  Griego further conceded that the child's arms were bruised enough to make Garcia call paramedics to ensure the child was not seriously injured.  See Tr. at 13:5-10 (Baker).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013) (Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting) (emphasis in original).[23]  Once the movant meets this burden, rule 56 requires the nonmoving

---

[22]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

[23]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment

party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123

_____

burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty

Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.  550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."  York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (brackets omitted).  "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[24]] explained that the

---

[24]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller, Lobozzo v. Colorado Department of Corrections, 429 F. App'x 707, 710 (10th Cir. 2011), Teigen v. Renfrow, 511 F.3d 1072 (10th Cir. 2007), and McCrary v. Aurora Public Schools, 57 F. App'x 362 (10th Cir. 2003) have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]"    Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)

(Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we
> take the facts "in the light most favorable to the party asserting the injury." Scott
> v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the
> plaintiff's version of the facts," id. at 378, unless that version "is so utterly
> discredited by the record that no reasonable jury could have believed him," id.
> at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that
> completely contradicted his version of the events.  550 U.S. at 379.  Here, there is
> no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads'
> testimony. There is only other witnesses' testimony to oppose his version of the
> facts, and our judicial system leaves credibility determinations to the jury. And
> given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory
> problems go to the weight of his testimony, not its admissibility . . . .  Mr. Rhoads
> alleges that his injuries resulted from a beating rendered without resistance or
> provocation. If believed by the jury, the events he describes are sufficient to
> support a claim of violation of clearly established law under Graham v. Connor,
> 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

that will serve as the foundation for answering the legal question before the court," before

inquiring into whether there are genuine issues of material fact for resolution by the jury.

584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th

Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes

are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the

plaintiffs' facts").

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right

secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law."  West v. Atkins, 487

U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or

reasonably should have known that their conduct would lead to the deprivation of a plaintiff's

constitutional rights by others, and an unforeseeable intervening act has not terminated their

liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal

connection is satisfied if [the defendants] set in motion a series of events that [the defendants]

knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their]

constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).  The

Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C.

§ 1983.  See Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)("Because vicarious liability is

- 16 -

inapplicable to <u>Bivens</u>[25] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); <u>Bd. of Cnty. Comm'rs v. Brown</u>, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor." <u>Garcia v. Casuas</u>, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011) (Browning, J.)(citing <u>Monell</u>, 436 U.S. at 689).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  <u>See</u> <u>Barney v. Pulsipher</u>, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

      **1.**      <u>**Color of State Law.**</u>

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." <u>Jojola v. Chavez</u>, 55 F.3d 488, 492 (10th Cir. 1995).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" <u>West v. Atkins</u>, 487 U.S. at 49 (quoting <u>United States v. Classic</u>, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." <u>Jojola v. Chavez</u>, 55 F.3d at 493.  Accordingly, at a base level, to find that an action was taken

---

[25]In <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).

The Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'" Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmondson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.  Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(citations omitted) (quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2.    Individual Liability.

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing

the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell, 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations.  The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).[26]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995).  "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."  72 F.3d at 400.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d

---

[26]The Court clarified in Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1188 (D.N.M. Aug. 29, 2014)(Browning, J.), that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit."  41 F. Supp. 3d at 1273.

1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."  Martinez v. Carson, 697 F.3d at 1255.  The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest.  The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him.  Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no."  The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability.  See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047 (quoting WILLIAM LLOYD PROSSER ET AL., PROSSER AND KEETON ON TORTS § 44, at 303-04 (5th ed.1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing RESTATEMENT (SECOND) OF TORTS § 453 cmt.b (1965)).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economu, 438 U.S. 478, 504 (1978).  "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights.  But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2030-31 (2011).

- 21 -

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. at 232 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity, the plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

1.    **Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense. In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial. See Pearson v. Callahan 555 U.S. at 241. In

rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise." 555 U.S. at 237. The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted)(internal quotation marks omitted). See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's precedent and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily"). Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails. See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases;" (ii) "it appears that the question will soon be decided by a higher court;" (iii) deciding the constitutional question requires "an uncertain interpretation of state law;" (iv) "qualified immunity is asserted at the pleading stage" and "the precise factual basis for the . . . claim . . . may be hard to identify;" (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established

and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question, because "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d at 1180-81 (quoting Pearson v. Callahan, 555 U.S. at 236-42).

Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern where guidance on the constitutionality of the challenged conduct is necessary and the conduct is only likely to face challenges in the qualified immunity context. See Camreta v. Greene, 131 S. Ct. at 2031-32. See Kerns v. Bader, 663 F.3d at 1181.[27]

---

[27]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights, and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil

remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:

> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, exception that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added). The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violation where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

"Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 131 S. Ct. at 2080 (quoting Pearson v. Callahan, 555

---

constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.).

U.S. 223, 236-37 (2009)).  See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should

think hard, and then think hard again, before turning small cases into large ones.").  Cf. Glover v.

Gartman, No. CIV 11-0752 JB/LAM, 2012 WL 4950756, at *30 n.5 (D.N.M. Sept. 27,

2012)(Browning, J.)(expressing concern regarding Justice Elena Kagan's comments about

"large" and "small" cases, and noting that, as a trial court judge, the Court must both find the law

and facts correctly and accurately, but must also give its attention and time to each litigant before

the Court).[28]  The Tenth Circuit will remand a case to the district court for further consideration

---

[28]In Kerns v. Board of Commissioners, 888 F. Supp. 2d 1176 (D.N.M. 2012)(Browning, J.), the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

> While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases. 131 S.Ct. at 2032. As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on

when the district court has given cursory treatment to the qualified immunity issue.  See Kerns v.

Bader, 663 F.3d at 1182.

---

that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S.Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S.Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S.Ct. 1235 (2012). In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S.Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S.Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S.Ct. at 1241, 1250. The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think that those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

888 F. Supp. 2d at 1222 n.35.

## 2. __Clearly Established Rights in the Qualified Immunity Analysis.__

In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  See Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."    Anderson v. Creighton, 483 U.S. 635, 640 (1987).   "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."   Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  While a case directly on point is not required, the Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate."   Ashcroft v. al-Kidd, 131 S. Ct. at 2083.   "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."   Anderson v. Creighton, 483 U.S. at 639.   "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established."   Ashcroft v. al-Kidd, 131 S. Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs," as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader, that although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference."   Kerns v. Bader, 663 F.3d at 1188 (emphasis in original).   In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."   Kerns v. Bader, 663 F.3d at 1183 (emphasis added). Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be

defined, applied a sliding scale to determine when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

## LAW REGARDING UNCONSTITUTIONAL IMPRISONMENT

The Tenth Circuit has explained that a plaintiff alleging that the "government has unconstitutionally imprisoned him has at least two potential constitutional claims: 'The initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause.'"  Mondragon v. Thompson, 519 F.3d 1078, 1082 (10th Cir. 2008)(quoting Pierce v. Gilchrist, 359 F.3d 1279, 1285-86 (10th Cir. 2004)).  If the plaintiff was imprisoned without legal process, his Fourth Amendment claim[29] is analogous to false arrest or false imprisonment; if he was imprisoned "pursuant to legal but wrongful process, he has a claim under the procedural component of the Fourteenth Amendment's Due Process Clause analogous to a tort claim for malicious prosecution."  519 F.3d at 1082.  More recently, the Tenth Circuit has explained that the

---

[29]The Tenth Circuit clarified that, because the Fourteenth Amendment incorporates the Fourth Amendment's protections against the states, a Fourth Amendment claim against state actors is also a Fourteenth Amendment claim.  See Mondragon v. Thompson, 519 F.3d at 1082 n.3.  The Court will likewise "avoid this terminology here to reduce confusion," opting instead to refer to the Fourth Amendment in reference to the right to be free from unlawful seizures, and the Fourteenth Amendment in reference to the right to due process.  Mondragon v. Thompson, 519 F.3d at 1082 n.3.

Fourteenth Amendment claim analogous to a malicious prosecution claim would not be available if an adequate state remedy exists, but a plaintiff may have the option of bringing a Fourth Amendment claim using a similar malicious prosecution theory.  See Myers v. Koopman, 738 F.3d 1190, 1192 (10th Cir. 2013).

In Myers v. Koopman, the plaintiff alleged that a detective fabricated facts to create the illusion of probable cause and, as a result, the plaintiff spent three days in custody.  See 738 F.3d at 1192.  The plaintiff brought a claim under § 1983 for malicious prosecution, alleging that the detective violated his Fourth and Fourteenth Amendment rights.  See 738 F.3d at 1192.  The plaintiff brought the Fourteenth Amendment malicious prosecution claim based on the detective's conduct in "conjur[ing] up facts to create the illusion of probable cause for an arrest warrant and subsequent prosecution."  738 F.3d at 1193.  The Tenth Circuit explained that "[t]he Fourteenth Amendment protects individuals against deprivations of liberty without due process of law.  If a state actor's harmful conduct is unauthorized and thus could not be anticipated pre-deprivation, then an adequate post-deprivation remedy -- such as a state tort claim -- will satisfy due process requirements."  738 F.3d at 1193 (citations omitted).  Because a malicious prosecution claim under Colorado law was available, the Tenth Circuit affirmed the district court's dismissal: "The existence of the state remedy flattens the Fourteenth Amendment peg on which [the plaintiff] now tries to hang his § 1983 malicious-prosecution claim."  738 F.3d at 1193.  The plaintiff also brought a malicious prosecution claim under the Fourth Amendment; the district court analogized the claim to a false imprisonment claim, but the Tenth Circuit said that the plaintiff was correct in casting his claim as malicious prosecution, "because he was seized after the institution of legal process."  738 F.3d at 1194.  The Tenth Circuit described the

difference between a § 1983 claim for false imprisonment and malicious prosecution under the

Fourth Amendment:

> What separates the two claims? -- the institution of legal process. Unreasonable seizures imposed without legal process precipitate Fourth Amendment false imprisonment claims. See Wallace[ v. Kato], 549 U.S. [384,] 389 [(2007)] (concluding that false imprisonment was the proper analogy where defendants did not have a warrant for the plaintiff's arrest and thus detention occurred without legal process). Unreasonable seizures imposed with legal process precipitate Fourth Amendment malicious-prosecution claims. See Heck[ v. Humphrey], 512 U.S. [477,] 484 [(1994)] (where detention occurs with legal process the "common-law cause of action for malicious prosecution provides the closest analogy"). Like rain and snow, the claims emanate from the same source, but under different conditions.

738 F.3d at 1194 (footnote omitted). The Tenth Circuit explained that the plaintiff was "arrested

pursuant to a validly issued -- if not validly supported -- arrest warrant" and that the plaintiff's

suit "challenges the probable-cause determination that generated the legal process." 738 F.3d at

1195.

### 1.      **Malicious Prosecution.**

The Tenth Circuit "has recognized the viability of malicious prosecution claims under

§ 1983." Taylor v. Meacham, 82 F.3d 1556, 1560 (10th Cir. 1996). To establish a malicious-

prosecution claim under § 1983, a plaintiff must prove that the defendant initiated or continued a

proceeding against him without probable cause. See Becker v. Kroll, 494 F.3d 904, 913-14 (10th

Cir. 2007). "Unlike a false arrest or false imprisonment claim, malicious prosecution concerns

detention only after the institution of legal process." Wilkins v. DeReyes, 528 F.3d 790, 798

(10th Cir. 2008)(internal quotation omitted). "In this context, a Fourth Amendment violation can

exist only when a plaintiff alleges the legal process itself to be wrongful." Wilkins v. DeReyes,

528 F.3d at 798.

Under Tenth Circuit case law, a § 1983 malicious prosecution claim includes the following elements: (i) the defendant caused the plaintiff's continued confinement or prosecution; (ii) the original action terminated in favor of the plaintiff; (iii) no probable cause supported the original arrest, continued confinement, or prosecution; (iv) the defendant acted with malice; and (v) the plaintiff sustained damages.  See Wilkins v. DeReyes, 528 F.3d at 799. In a Fourth-Amendment malicious-prosecution case, "the third element deals only with the probable cause determination during the institution of legal process."  Wilkins v. DeReyes, 528 F.3d at 799.

### 2.      False Arrest and Imprisonment.

The Tenth Circuit has explained that a false arrest or imprisonment claim is appropriate when a person has been imprisoned without legal process.  See Mondragon v. Thompson, 519 F.3d at 1082.  The claim arises under the Fourth Amendment after an unlawful arrest and before the institution of legal process; the claim accrues when the plaintiff is released or legal process is instituted to justify the imprisonment.  See Mondragon v. Thompson, 519 F.3d at 1083.  To state a claim for false arrest, a plaintiff must show two elements:

> First, the plaintiff must prove that the defendant has deprived him of a right secured by the "Constitution and laws" of the United States.  Second, the plaintiff must show that the defendant deprived him of this constitutional right "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory."  This second element requires that the plaintiff show that the defendant acted "under color of law."

Smith v. Plati, 258 F.3d 1167, 1175 (10th Cir. 2001)(quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970)).

### NEW MEXICO LAW REGARDING FALSE ARREST AND FALSE IMPRISONMENT

"Under New Mexico law, 'false imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful

- 34 -

authority to do so.'" Romero v. Sanchez, 1995-NMSC-028, ¶ 13, 895 P.2d 212, 215 (quoting NMSA 1978, § 30-4-3). False arrest or unlawful detention occurs when the "facts available to [a] detaining officer would [not] warrant [a] person of reasonable caution to believe detention appropriate." Romero v. Sanchez, 1995-NMSC-028, ¶ 13 (stating that "[u]nlawful detention has similar requirements" to false imprisonment). While the Supreme Court of New Mexico appears to recognize them as separate torts, the Court of Appeals of New Mexico more recently has found that "[a] false arrest is merely one way of committing false imprisonment." Santillo v. N.M. Dep't of Pub. Safety, 2007-NMCA-159, ¶ 12, 173 P.3d 6, 11 (citing 32 AM. JUR. 2D FALSE IMPRISONMENT § 3 (2007)). See Wallace v. Kato, 549 U.S. 384, 388-89 (2007)("False arrest and false imprisonment overlap; the former is a species of the latter."); Butler ex rel. Butler v. Rio Rancho Pub. Sch. Bd. of Educ., 245 F. Supp. 2d 1203, 1211 (D.N.M. 2002)("The torts of false arrest and false imprisonment are similar."); D. DOBBS, THE LAW OF TORTS § 36, at 67 (2000)("False arrest is a term that describes the setting for false imprisonment when it is committed by an officer or by one who claims the power to make an arrest.").

New Mexico state courts have not stated when a plaintiff's causes of action for false arrest and for false imprisonment accrue. These courts, however, often look to the law as stated in the RESTATEMENT (SECOND) OF TORTS. See Montanez v. Cass, 1975-NMCA-142, ¶ 46, 546 P.2d 1189, 1195 ("It has long been the policy of our courts to follow in the footsteps of the RESTATEMENT OF TORTS, 2d."). In Schmitz v. Smentowski, 1990-NMSC-002, 785 P.2d 726, the Supreme Court of New Mexico stated: "We have also been very willing to adopt the view of the RESTATEMENT OF TORTS to assist our development of new tort areas." 1990-NMSC-002, ¶ 49, 785 P.2d 726, 736. The Supreme Court of New Mexico explained:

> Accordingly, New Mexico has recognized as tortious inducing a breach of
> contract, adopting the view promulgated in RESTATEMENT OF TORTS § 766

(1939).  Wolf v. Perry, 65 N.M. 457, 461, 339 P.2d 679, 681 (1959)(requiring that "one who, without justification or privilege to do so, induces a third person not to perform a contract with another, is liable to the other for the harm caused thereby"); see also Williams v. Ashcraft, 72 N.M. 120, 381 P.2d 55 (1963)(recognizing the tort of wrongful interference with another's business relations).  We have adopted the cause of action of intentional interference with prospective contractual relations, relying on the tort as articulated in Restatement (Second) of Torts § 766(B) (1977).  M & M Rental Tools, Inc. v. Milchem, Inc., 94 N.M. 449, 452-54, 612 P.2d 241, 244-46 (Ct. App. 1980)(one who, with "bad motive," intentionally interferes with another's prospective contractual relations, is subject to liability); Anderson v. Dairyland Ins. Co., 97 N.M. 155, 158-59, 637 P.2d 837, 840-41 (1981).  These torts reflect the underlying theory of prima facie tort as applied to contractual relations -- the underlying malicious motive of a defendant's actions, done without justification, makes an otherwise lawful act, competition, tortious.

New Mexico has also recognized the tort of intentional infliction of emotional distress, relying on Restatement (Second) of Torts § 46 (1965), Mantz v. Follingstad, 84 N.M. 473, 479-80, 505 P.2d 68, 74-75 (Ct. App. 1972); Ramirez v. Armstrong, 100 N.M. 538, 673 P.2d 822 (1983), and we have recognized that the intentional and wrongful deprivation of the right to vote or hold public office creates tort liability. Valdez v. Gonzalez, 50 N.M. 281, 176 P.2d 173 (1946).

Schmitz v. Smentowski, 1990-NMSC-002, ¶¶50-51, 785 P.2d at 736.  See Baldonado v. El Paso Natural Gas Co., 2008-NMSC-005, 176 P.3d 277, 283 (adopting the elements of intentional infliction of emotional distress from RESTATEMENT (SECOND) OF TORTS § 46); Berlangieri v. Running Elk Corp., 2003-NMSC-024, 76 P.3d 1098, 1104 ("The rule [for acceptance of risk] followed by the courts of this state thus far tracks the rule followed in a majority of other courts, as well as the RESTATEMENT (SECOND) OF TORTS § 496B (1965).").  The Supreme Court of New Mexico, however, has also stated that "the Restatement is merely persuasive authority entitled to great weight that is not binding on this Court."  Gabaldon v. Erisa Montg. Co., 1999-NMSC-039, 990 P.2d 197, 204.  See Blake v. Public Serv. Co, 2004-NMCA-002, 82 P.3d 960 (noting that

New Mexico courts have not adopted RESTATEMENT (SECOND) OF TORTS § 324A, Liability to Third Person for Negligent Performance of Undertaking, declining to decide whether to do so).

## LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). Federal courts "possess only that power authorized by [the] Constitution and statute . . . ." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction. See 28 U.S.C. §§ 1331-32.

**1.      Supplemental Jurisdiction.**

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552. The Supreme Court has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines -- pendent and ancillary jurisdiction.[30] Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). Ancillary jurisdiction gives federal courts the flexibility to

---

[30]The Tenth Circuit has noted that Congress' intent in passing 28 U.S.C. § 1367 was to supersede the common-law doctrine of pendent jurisdiction: "Effective December 1, 1990, Congress enacted legislation, codified at 28 U.S.C. § 1367 (1976 & Supp. 1992), which supersedes the common law pendent jurisdiction doctrine." Baker v. Bd. of Regents of State of Kan., 991 F.2d 628, 634 (10th Cir. 1993)(citing Whalen v. Carter, 954 F.2d 1087, 1097 (5th Cir. 1992), and Aschinger v. Columbus Showcase Co., 934 F.2d 1402 (6th Cir. 1991)).

"entertain[] a non-federal, non-diversity claim asserted by a party other than the plaintiff, usually in a diversity of citizenship case," although occasionally in admiralty cases as well.   13 C. Wright & A. Miller, Federal Practice & Procedure § 3523, at 173 & n.45. (3d ed. 2008).

In 1988, Chief Justice William H. Rehnquist created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms.  See James v. Chavez, No. CIV 09-0540 JB/CG, 2011 WL 6013547, at *5 (D.N.M. November 21, 2011)(Browning, J.)(citing 16 Moore's Federal Practice § 106.04[5], at 106-22 (Matthew Bender 3d ed. 2013)).  In response to the Committee's findings regarding pendent and ancillary jurisdiction, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence." Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

### 2.    District Court Discretion.

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion.  See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi.

v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction.  The traditional analysis, based on the Supreme Court's opinion in _United Mine Workers v. Gibbs,_ compelled courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction.  383 U.S. at 726.  Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

(1)     the claim raises a novel or complex issue of State law,

(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)     the district court has dismissed all claims over which it has original jurisdiction, or

(4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).   In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity . . . ."  Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.  _See_ Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir.1998)("[S]ection 1367 has indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994) ("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Executive Software N. Am. v. U.S. Dist.

Court, 24 F. 3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of _Gibbs_ in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."), overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp., 533 F.3d 1087 (9th Cir. 2008); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c) . . . .")(emphasis in original); Bonadeo v. Lujan, No. CIV 08–0812 JB/ACT, 2009 WL 1324119, at *8 (D.N.M. April 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists.").  At least one other district court in the Tenth Circuit besides this Court has reached the same conclusion.  See Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)(Crow, J.)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

The Tenth Circuit has held that district courts should generally decline jurisdiction over state claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."  Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)).  The Supreme Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.  Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Amer. v. Gibbs, 383 U.S. at 726.  The Court has previously stated that a district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c) applies.  See Armijo v. New Mexico, No. CIV 08-0336, 2009 WL 3672828, at *4 (D.N.M. September 30, 2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it.").  The Tenth Circuit has recognized that a district court does not "abuse [its] discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction[.]'"  Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished).

## ANALYSIS

The Court will grant the MSJ as to all of Griego's federal claims.  First, Griego's federal claims for false imprisonment, false arrest, and malicious prosecution fail because Stockton had probable cause to arrest Griego.  Second, Griego's municipal liability claims also fail because he has not established that Stockton committed an underlying constitutional violation.  Third, even if Stockton did violate Griego's constitutional rights by arresting him, the law was not clearly established and Stockton is entitled to qualified immunity.  The Court will dismiss all of Griego's federal claims with prejudice.  The Court will decline to exercise supplemental jurisdiction and will thus dismiss the remaining state law claims without prejudice.

## I.    STOCKTON IS ENTITLED TO QUALIFIED IMMUNITY, BECAUSE HE HAD PROBABLE CAUSE TO ARREST GRIEGO.

When Stockton investigated the domestic dispute, Petersen told him that Griego was angry and kicked her hard enough to make her fall.  See MSJ ¶¶ 10-11, at 4.  Stockton also observed red marks on Petersen's knee.  See MSJ ¶ 12, at 5.  Griego then corroborated Petersen's allegations by admitting to pushing Petersen away with his foot.  See MSJ ¶ 16, at 5-6.  This

admission, coupled with Petersen's story and injury, were sufficient to provide Stockton probable cause to arrest Griego. Because Stockton had probable cause, Griego's claims for false arrest, false imprisonment, and malicious prosecution fail.

## A. GRIEGO'S § 1983 FALSE ARREST AND FALSE IMPRISONMENT CLAIMS -- COUNTS ONE AND TWO -- FAIL BECAUSE STOCKTON HAD PROBABLE CAUSE.

"To maintain a false arrest or false imprisonment claim under § 1983, [the plaintiff] 'must demonstrate the elements of a common law claim and show that [his] fourth Amendment right to be free from unreasonable search and seizure has been violated.'" Chavez v. Cnty. of Bernalillo, 3 F. Supp. 3d 936, 996 (D.N.M. 2014)(Browning, J.)(quoting Trimble v. Park Cnty, Bd. of Comm'rs, 242 F.3d 390, 2000 WL 1773239, at *3 (10th Cir. 2000)(table decision)). Although constitutional torts are not based on any specific state's tort law, courts generally use the common law of torts as a "starting point" for determining the contours of constitutional violations under § 1983. Pierce v. Gilchrist, 359 F.3d at 1286 (explaining that, although "'common law' is not limited to the formulation provided by the state in which the tort occurred," the Tenth Circuit has "considered the state law formulation" of false arrest and false imprisonment). Under New Mexico law, false imprisonment is "intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so." Fuerschbach v. Sw. Airlines Co., 439 F.3d 1197, 1207 (10th Cir. 2006)(Lucero, J.). False arrest occurs when "the facts available to a detaining officer would not warrant a person of reasonable caution to believe detention appropriate." Fuerschbach v. Sw. Airlines Co., 439 F.3d at 1207 (internal quotation marks and citation omitted).

"A defendant possessed of a good faith and reasonable belief in the lawfulness of the action is not liable for false imprisonment or false arrest." Fuerschbach v. Sw. Airlines Co., 439 F.3d at 1207-08. To have a "good faith belief," the officer must ordinarily have "probable cause

- 42 -

to arrest." Fuerschbach v. Sw. Airlines Co., 439 F.3d at 1207-08.  Thus, even if a plaintiff can show he was falsely imprisoned, he only "states a claim for false imprisonment in violation of § 1983 by specifically alleging facts that show a government official acted with deliberate or reckless intent to falsely imprison the plaintiff."  Romero v. Fay, 45 F.3d 1472, 1480 (10th Cir. 1995)(Baldock, J.).  "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law."  Major v. Benton, 647 F.2d 110, 113 (10th Cir. 1981).  "[U]nder state common law . . . the slightest interference with personal liberty is a false imprisonment.  It does not follow that all such invasions however trivial or frivolous serve to activate remedies" under the Constitution.  Wells v. Ward, 470 F.2d 1185, 1187 (10th Cir. 1972)(Doyle, J.).

Defendants in § 1983 cases based on warrantless arrests are entitled to qualified immunity if they had probable cause to arrest the plaintiff.  See Atwater v. Lago Vista, 532 U.S. 318, 322 (2001); Wilder v. Turner, 490 F.3d at 813.  Probable cause therefore serves as a defense to a claim of both false arrest and false imprisonment.  "Probable cause to arrest exists if the facts and circumstances within the officer's knowledge are sufficient to justify a prudent officer [to believe] the defendant committed or is committing an offense."  Wilder v. Turner, 490 F.3d at 813.  See Devenpeck v. Alford, 543 U.S. 146, 152 (2004)("[A] warrantless arrest by a law enforcement officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.").  "Probable cause only requires a probability of criminal activity, not a *prima facie* showing of such activity."  Wilder v. Turner, 490 F.3d at 813.  See Painter v. City of Albuquerque, 383 F. App'x 795, 798 (10th Cir. 2010)(Gorsuch, J.).  Moreover, because probable cause for a warrantless arrest is determined at the time the officer made the arrest, "the validity of such an arrest is not undermined by

subsequent events in the suspect's criminal prosecution such as dismissal of charges."  Wilder v. Turner, 490 F.3d at 813.

Here, the facts within Stockton's knowledge at the time he arrested Griego are sufficient to lead a reasonable police officer to believe that Griego committed the crimes for which he was arrested.  First, battery on a household member under New Mexico law consists of "the unlawful, intentional touching or application of force to the person of a household member, when done in a rude, insolent or angry manner."  N.M. Stat. Ann. § 30-3-15(A).  Second, abandonment or abuse of a child consists of "knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be placed in a situation that might endanger the child's life or health."  N.M. Stat. Ann. § 30-6-1D1.

The undisputed facts demonstrate that Petersen told Stockton that Griego scared and intimidated Petersen, and that they struggled over their daughter.  See MSJ ¶ 10, at 4; Transcript of State Trial at 116:17-117:11; id. at 64:1-12;  id. at 66:11-67:3.  Both Griego and Petersen fought for the three-year-old child and pulled her in different directions.  During the struggle, Griego kicked Petersen, knocking her to the ground.  See MSJ ¶¶ 10-11, at 4.  When Stockton arrived at Petersen's home, he found her crying and visibly shaking.  See MSJ ¶ 9, at 4. Stockton observed the physical marks and redness on Petersen's shin that had not subsided in the three hours since the dispute occurred.  See MSJ ¶ 12, at 5.  When Stockton investigated, Griego confirmed Petersen's allegations.  See MSJ ¶ 16, at 5-6.  Stockton therefore had reason to believe that Griego committed an intentional touching or application of force to another household member in a rude, insolent, or angry manner, as the crime of battery on a household member requires.  See N.M. Stat. Ann. § 30-3-15(A).  This belief is sufficient to give a reasonable police

officer probable cause to arrest Griego for battery on a household member.  See Wilder v. Turner, 490 F.3d at 813; Devenpeck v. Alford, 543 U.S. at 152.

Additionally, Stockton had information suggesting that the domestic dispute endangered the child.  Griego repeatedly told Stockton that the dispute hurt the child.  See Response ¶ 8, at 4; Transcript of Officer Stockton's Belt Tape at 13:1 (stating that "she was hurt"); id. at 13:11-15 (describing the dispute as hurting the child); id. at 13:19-20 (stating that he pushed Petersen with his foot because the dispute was hurting the child); Tr. at 17:7-15 (Baker)(admitting that Griego told Stockton that the dispute hurt the child).  Griego further told Stockton that Garcia "saw some marks" on her arms "and called paramedics."  Transcript of Officer Stockton's Belt Tape at 17:15-19.  The child's arms were bruised enough to make Garcia call paramedics to ensure the child was not seriously injured.  Tr. at 13:5-10 (Baker).  Stockton therefore had reason to believe that: (i) Griego knowingly, intentionally, or negligently pushed Petersen while struggling for control of the child; and (ii) the struggle harmed and endangered the child.

Griego contends that the struggle -- not his actions alone -- injured the child.  This fact does not negate probable cause.  The felony of abandonment or abuse of a child requires that the suspect "caus[ed] or permit[ted] a child to be placed in a situation that might endanger the child's life or health."  N.M. Stat. Ann. § 30-6-1D1 (emphasis added).  It does not require the officer to find that the suspect himself caused the injury or even that the child be injured.  See State v. Pagan-Rivera, 2015 WL 5512011, at *13.  Rather, it is sufficient that the suspect "knowingly, intentionally, or negligently" "permit[ted]" the child to be in a potentially threatening situation.  N.M. Stat. Ann. § 30-6-1D1 (emphasis added).  In State v. Pagan-Rivera, the Supreme Court of New Mexico concluded that a reasonable jury could have found the defendant guilty of child abuse when he fired a gun in the same house as his children, because the defendant should have

- 45 -

known that his conduct created a risk of harm.  See 2015 WL 5512011, at *13.  The defendant did not injure the children, nor did he intend to hurt them in any way.  See 2015 WL 5512011, at *13.

Griego likewise did not intend to injure his child, but his actions nonetheless put the child in the middle of a violent domestic dispute involving hitting and pushing.  He knew the dispute was escalating.  He knew that the dispute was injuring the child.  See Response ¶ 8, at 4.  Based on the facts Stockton knew at the time of arrest, a reasonable officer could have found that Griego permitted the child to remain in a situation that would endanger the child's health.  See Wilder v. Turner, 490 F.3d at 813; Devenpeck v. Alford, 543 U.S. at 152.  That Griego was not ultimately convicted of the offense does not change the result.  "Probable cause only requires a probability of criminal activity, not a prima facie showing of such activity."  Wilder v. Turner, 490 F.3d at 813.  Because Stockton had probable cause to arrest Griego, thereby defeating his false arrest claim, Griego also cannot prevail on his false imprisonment claim.  "[C]laims of false arrest, false imprisonment, and malicious prosecution must be premised on a lack of probable cause."  Hoffman v. Martinez, 92 F. App'x 628, 631 (10th Cir. 2004)(Anderson, J.).  See Kerns v. Bader, 663 F.3d at 1187.

Griego argues that Stockton had already decided to arrest him when Stockton arrived at Griego's home, demonstrating that Stockton did not have probable cause.  See Response at 7-8, 17.  Stockton did not arrest Griego until after Griego confirmed Petersen's testimony.  See MSJ ¶ 17, at 6.  Thus, Stockton had enough information at the time he arrested Griego to establish probable cause.  Moreover, the probable cause inquiry examines whether a reasonable officer would have had probable cause based on the facts and circumstances in existence when Stockton arrested Griego.  See Devenpeck v. Alford, 543 U.S. at 152; Wilder v. Turner, 490 F.3d at 813.

**B.    GRIEGO'S § 1983 MALICIOUS PROSECUTION CLAIM -- COUNT 3 -- FAILS BECAUSE STOCKTON HAD PROBABLE CAUSE.**

To establish a malicious prosecution claim pursuant to § 1983, a plaintiff must prove: (i) that the defendant caused the plaintiff's continued confinement or prosecution; (ii) that the original action terminated in the plaintiff's favor; (iii) that no probable cause supported the original arrest, continued confinement or prosecution; (iv) that the defendant acted with malice; and (v) that the plaintiff sustained damages.  See Novitsky v. City of Aurora, 491 F.3d 1244, 1258 (10th Cir. 2007)(Henry, J.); Pierce v. Gilchrist, 359 F.3d at 1291-97. Because Stockton had probable cause to arrest Griego, Griego cannot satisfy all of the elements of a malicious prosecution claim.  "[C]laims of false arrest, false imprisonment, and malicious prosecution must be premised on a lack of probable cause."  Hoffman v. Martinez, 92 F. App'x at 631.

**C.    GRIEGO'S § 1983 CLAIM FOR "ARRESTS CONDUCTED WITHOUT PROBABLE CAUSE OR ARREST WARRANTS" -- COUNT SEVEN -- FAILS BECAUSE STOCKTON HAD PROBABLE CAUSE.[31]**

Griego alleges that Stockton and the City of Albuquerque violated Griego's constitutional rights by "seiz[ing] and arrest[ing] individuals, including GRIEGO, despite the lack of an arrest warrant or probable cause to justify their arrest and imprisonment."  Complaint ¶ 116, at 26.[32]  A lack of probable cause is an essential element of malicious prosecution.  See Novitsky v. City of Aurora, 491 F.3d at 1258; Wolford v. Lasater, 78 F.3d 484, 489 (10th Cir. 1996); Hoffman v. Martinez, 92 F. App'x 628, 631 (10th Cir. 2004).  As stated above, Stockton had probable cause to arrest Griego, so Count Seven fails.  "[C]laims of false arrest, false imprisonment, and

---

[31]In Count Seven, Griego alleged claims against Stockton, the City of Albuquerque, and the APD.  See Complaint ¶¶ 115-121, at 26-27.  The Court already dismissed Griego's claims against the APD in its earlier MO.  See MO at 62-63.

[32]To the extent Griego asserts state law claims in addition to his federal claims in Count Seven, the Court does not address the state law claims.  It addresses only Griego's federal claims and dismisses any state law claims without prejudice.

malicious prosecution must be premised on a lack of probable cause." Hoffman v. Martinez, 92 F. App'x at 631. Municipalities may not be liable under § 1983 unless one of the city's officers committed an underlying constitutional violation. See Hinton v. City of Elwood, Kan., 997 F.2d 774, 782 (10th Cir. 1993); Thompson v. City of Lawrence, 58 F.3d 1511, 1517 (10th Cir. 1995). Because Stockton did not commit an underlying constitutional violation, the City of Albuquerque cannot be held liable.

## II. STOCKTON DID NOT VIOLATE GRIEGO'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS.

When a defendant asserts qualified immunity, the plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the rights were clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d at 1107. Although Stockton did not violate Griego's constitutional rights by arresting him, the Court concludes that, even if a constitutional violation occurred, the law was not clearly established so that a reasonable officer in Stockton's position would have understood he was violating Griego's constitutional rights.

To be clearly established, the right must be "so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't Of Corr., 429 F. App'x at 710 (quoting Zweibon v. Mitchell, 720 F.2d at 172-73). In the context of unlawful arrests, the court must ask "whether officers arguably had probable cause." Kaufman v. Higgs, 697 F.3d 1297, 1300 (10th Cir. 2012)(emphasis added). Griego argues that Stockton violated his rights because the requirement that officers have probable cause to arrest is clearly established. See Response at 20. The question, however, is not whether individuals have a constitutional right to be arrested only on the basis of probable cause, but "whether it was beyond debate" that this particular arrest "lacked legal justification."

- 48 -

Kerns v. Bader, 663 F.3d at 1183.  Accordingly, Griego must show that no police officer acting reasonably under the circumstances confronting Stockton could have believed that he had probable cause to arrest Griego.   See Sevigny v. Dicksey, 846 F.2d 953, 956 (4th Cir. 1988)(Phillips, J.).  Griego does not make that showing.

Even if the facts Stockton knew at the time he arrested Griego were insufficient to constitute probable cause, they were enough to allow a reasonable officer in his shoes to believe probable cause existed.   See Saucier v. Katz, 553 U.S. at 205 (describing how qualified immunity shields officers who have "reasonable, but mistaken beliefs" and protects officers from the "hazy border[s]" of the law).  This situation is not similar to any of the cases that Griego cites regarding probable cause.   See Sevigny v. Dicksey, 846 F.2d at 956-58 (concluding that an officer lacked probable cause to arrest where he failed to interview witnesses at the scene of a car crash); Wagenmann v. Adams, 829 F.2d 196, 206-08 (1st Cir. 1987)(Selya, J.)(concluding that officers lacked probable cause to arrest the plaintiff based solely on unsubstantiated rumors and hearsay, without first determining if the crime had been committed at all); Moore v. Marketplace Restaurant, Inc., 754 F.2d 1336, 1345-47 (7th Cir. 1985)(Coffey, J.)(concluding that officers' failure to interview plaintiffs to determine if an offense had even been committed before arresting them presented a jury question whether the facts supplied probable cause).

As explained above, Stockton had credible information that Griego pushed Petersen with his foot during a domestic dispute that placed a child in danger and injured the child enough to warrant calling paramedics to the scene.  In contrast with the officer in Sevigny v. Dicksey who "was totally uncertain about what had happened," Stockton knew an offense had been committed and that Griego was the alleged perpetrator.   See Sevigny v. Dicksey, 846 F.2d at 957. Moreover, unlike the officer in Sevigny v. Dicksey who failed to make "even rudimentary

inquiries," Stockton corroborated Petersen's story by interviewing Griego and by investigating Petersen's injury.  See Sevigny v. Dicksey, 846 F.2d at 958.  Stockton complied with the law regarding probable cause that requires officers to interview witnesses readily available at the scene and investigate basic evidence by speaking to both Petersen and Griego, calling a field investigator to take pictures, and speaking with Garcia, who called paramedics for the child.  See Romero v. Fay, 45 F.3d at 1476-77.  "Objective inquiry into the reasonableness of an officer's perception of the critical facts leading to an arrest must obviously not take into account facts not available to him at the time."  Sevigny v. Dicksey, 846 F.2d at 956 n.5 (citing Anderson v. Creighton, 483 U.S. at 641-42).  Accordingly, Stockton conducted an investigation as thorough as any reasonable officer under the circumstances would have done, and his understanding was that of a reasonably informed police officer.

To violate clearly established law, the unlawfulness of Stockton's actions "must be apparent."  Anderson v. Creighton, 483 U.S. at 640.  The felony of abandonment or abuse of a child consists of "knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be placed in a situation that might endanger the child's life or health." N.M. Stat. Ann. § 30-6-1D1.  Griego contends that he was acting in self-defense by hitting Petersen with his foot.  Whether his actions would provide a "justifiable cause" for permitting the child to be in a dangerous situation under New Mexico law was, and remains, unclear.  Little case law interpreting the statute exists.  No courts have considered what constitutes "justifiable cause," and it is unclear whether Griego's actions would constitute self-defense.  Courts have similarly not addressed what amounts to probable cause to arrest for child abuse.  Furthermore, the Supreme Court of New Mexico has described the law regarding the child abuse statute as confusing and inconsistent.  See State v. Consaul, 2014-NMSC-030, ¶¶ 35-38 (describing "the

confusion that has plagued this area of the law" and attempting to clarify it).  Notably, the Supreme Court of New Mexico addressed the confusion surrounding the requisite intent in 2014 -- long after Stockton arrested Griego.  See State v. Consaul, 2014-NMSC-030, ¶¶ 35-38 (modifying prior cases holding that recklessness is not the culpability required for the crime of negligent child abuse).  Consequently, when Stockton arrested Griego, the state law of New Mexico was not clearly established.

Contrary to Griego's assertions, Stockton did not have to conduct detailed research into Petersen's past to determine whether her allegations were credible.  See Response at 5-6 (stating that Stockton should have investigated Petersen's "prior interaction with the police" to determine that "her credibility was questionable at best").  Nor did Stockton have to discredit his own investigations and opinions merely because a more senior officer -- Garcia -- did not decide to immediately arrest Griego after Garcia's sole interview with Griego and no further investigation. See Response at 6.  It would not have been clear to a reasonable officer that arresting Griego violated his constitutional rights.  See Saucier v. Katz, 533 U.S. at 202.

## III.   THE COURT WILL DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE REMAINING STATE LAW CLAIMS.

The Court's conclusion that summary judgment in the Defendants' favor is appropriate disposes of all federal claims in this case.  Given the Tenth Circuit's guidance that, "[w]hen all federal claims have been dismissed, the Court may, and usually should, decline to exercise jurisdiction over any remaining state claims," Smith v. City of Enid By and Through Enid City Comm'n, 149 F.3d at 1156, the Court concludes that dismissing the remaining state-law claims is the appropriate resolution of the matter.

IT IS ORDERED that: (i) Defendant's Motion for Summary Judgment, filed January 21, 2015 (Doc. 35), is granted in its entirety; (ii) all federal claims against Defendant Robert

Stockton, Jr., and the City of Albuquerque are dismissed with prejudice; and (iii) all state law claims are dismissed without prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Wayne Baker
Albuquerque, New Mexico

    *Attorney for the Plaintiff*

David Tourek
  City Attorney
Kristin J. Dalton
   Assistant City Attorney
Albuquerque City Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Defendants*